FAIRFAX COUNTY ECONOMIC DEVELOPMENT AUTHORITY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8296–80B.     Filed September 2, 1981.

*Benton Burroughs, Jr.*, and *Thomas O. Lawson*, for the petitioner.

*L. Michael Wachtel* and *Charles W. Rumph*, for the respondent.

## OPINION

TANNENWALD, *Chief Judge*: This is an action for declaratory judgment pursuant to section 7478.[1] The case was submitted for decision under Rule 122, on the basis of the administrative record and a stipulation of facts. See Rule 217. Petitioner has satisfied all the jurisdictional requirements. See Rule 210(c). The sole question presented is whether the proposed bonds are industrial development bonds which are exempt from Federal

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended. Similarly, unless otherwise indicated, any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

income taxes. Resolution of this question depends upon (1) whether the proposed bonds would be obligations of the United States; (2) whether the Federal Government or the U.S. Government Printing Office (GPO) is an "exempt person" within the meaning of section 103(b)(3)(A); and (3) for purposes of the $10 million small issue exemption of section 103(b)(6)(D), whether the capital expenditures in Fairfax County of the GPO, only, the legislative branch of the Federal Government, or the entire U.S. Government should be aggregated with those of the project involved. For the reasons set forth below, we hold that the proposed bonds would not be exempt from taxation.

We accept as true those facts represented in the administrative record and stipulation of facts. See Rule 217(b)(1). Only those facts necessary to our decision are set forth.

The petitioner was established by the General Assembly of the Commonwealth of Virginia as a body politic and corporate. It is engaged in fostering and stimulating the development of industry in Fairfax County, Va. Petitioner has the authority to issue bonds on behalf of Fairfax County which are payable solely from the revenues and receipts derived from leasing or sale of its facilities. It is an instrumentality of Fairfax County and is exempt from taxation by the Commonwealth of Virginia or any political subdivision of the Commonwealth.

Springbelt Associates Limited Partnership (Springbelt) is a limited partnership formed pursuant to the laws of Virginia. The general partner of Springbelt is Walt Robbins, Inc., a subchapter S Virginia corporation whose shares are solely owned by Walter C. Robbins, Jr. Mr. Robbins, individually, is the sole limited partner of Springbelt.

Two leases were entered into on December 22, 1978, between "Walt C. Robbins, Jr., or assigns" and the "United States of America" (the Government). The leases, printed on standard U.S. General Services Administration forms but including additional clauses, were each for one-half of a 250,000 square foot facility to be constructed for the GPO in the Springfield Industrial Park in Fairfax County. GPO intended to consolidate its facilities located throughout the metropolitan Washington area in this location.

The leases were each for 10 years, with two 5-year renewal options. Each included a 6-year call provision, allowing a

termination by GPO of the remaining portion of the lease, subject to a requirement of 1 year's notice to the lessor (Springbelt). This provision was inserted because GPO was planning to build a new facility in Washington, D.C., to house its offices, printing operations, documents, and warehouse space.

Walter C. Robbins, Jr., assigned his interest in the leases to Springbelt.

On February 13, 1979, petitioner adopted a resolution in which it agreed to assist Springbelt in privately placing a loan to acquire and construct the GPO facility. The effect of this resolution was that petitioner would attempt to issue its revenue bonds to provide permanent financing for the construction of the facility and the acquisition of the land (which was to be conveyed to petitioner prior to the commencement of construction). Although this resolution was valid for only 6 months, subsequent resolutions were passed extending it until such time as the final determination is made as to whether the proposed bonds would qualify as tax-exempt industrial development bonds.

Construction financing for the facility was to be obtained from several banks and would be paid off at such time as the bond proceeds became available. Springbelt would convey the completed facility to petitioner and would be recompensed with proceeds of the proposed bonds. Petitioner and Springbelt would then enter into an installment sales contract whereby Springbelt would purchase the facility and land from petitioner. The conveyances were subject to the above-mentioned leases.

It is estimated that approximately $5,300,000 of the $5,500,000 face amount of the bonds will be used for capital expenditures.[2]

The bonds are to be serial bonds, issued at 8 to 8¼ percent, which would be retired ratably over a 20-year period. Petitioner will not have any sinking fund or replacement reserve fund with respect to the bonds. There will be a 6-year call provision

---

[2]Thus, the requirement that substantially all, i.e., 90 percent, of the proceeds will be used for the acquisition, construction, reconstruction, or improvement of land or property of a character subject to the allowance for depreciation under sec. 167, would be met. See sec. 1.103–10(b)(2)(ii), Income Tax Regs.

in the bonds if the right to terminate the lease is exercised by the Government and a suitable replacement tenant is not found within 1 year. The bonds will be repaid solely from the receipts derived from the leasing or sale by petitioner of its facilities.[3]

Subsequent to February 13, 1979, Springbelt began construction of the facility. Construction has since been completed and the GPO is currently occupying the entire facility.

The capital expenditures in Fairfax County by the GPO or the Legislative Branch of the U.S. Government, with the addition of the $5.5 million of bonds in issue, did not exceed $10 million in the 3 years preceding the submission of this case.

The U.S. Government, by virtue of aggregation of capital expenditures from the Judicial, Executive, and Legislative branches, has made capital expenditures in Fairfax County, with the addition of the $5.5 million of bonds in issue, in excess of $10 million in the 3 years preceding the submission of this case.

Section 103(a)(1) provides that gross income does not include interest on the obligations of a State or any political subdivision of a State. This exemption has been an enduring feature of the Federal income tax. Compare section 103(a) with section II(B) of the Revenue Act of 1913, Pub. L. 63–16, 38 Stat. 168. Interest on obligations of the United States, however, has not been excluded from gross income without specific legislation relating to each issue. See Public Debt Act of 1941, ch. 7, sec. 4, 55 Stat. 7.[4]

Section 103(b) provides an exception to section 103(a) for industrial development bonds (IDBs).[5] A brief explanation of

---

[3]No funds will be invested in materially higher yielding securities or obligations which would cause the notes to be arbitrage bonds within the meaning of sec. 103(c)(2).

[4]Sec. 103(b) so provided until its repeal by the Tax Reform Act of 1976, Pub. L. 94–455, sec. 1901(a)(17), 90 Stat. 1765. That section was one of the so-called "Deadwood Provisions" of the act, and was deleted because there were no more tax-exempt Federal obligations outstanding. No substantive change was meant by its deletion. S. Rept. 94–938, 1976–3 C.B. (Vol. 3) 49, 529, 532–533. See also note 12 *infra*.

[5]In common parlance, industrial development bonds (IDBs) and industrial revenue bonds (IRBs) are interchangeable terms. Both refer to bonds that are issued by public agencies to finance facilities for private enterprises. Technically, the difference between them is that IRBs are backed solely by the revenues from the project or facility itself, while IDBs are backed by the full faith and credit of the public issuing authority. Although IDBs were the

the structure of section 103(b) will facilitate an understanding of the issues to be discussed herein. Section 103(b)(1) excludes IDBs from the tax-exempt treatment accorded obligations of State and local Governments by section 103(a). Section 103(b)(2) defines an IDB by reference to the trade or business in which the proceeds of the obligation are to be used, and to the source of (or security for) payment of the principal and interest of the obligation. Section 103(b)(2) explicitly excludes from its definition of IDBs obligations whose proceeds are to be used by an "exempt person," which term is defined by section 103(b)(3).

Section 103(b)(4) through (7) provides exemptions from the taxable status mandated by section 103(b)(1), notwithstanding the fact that the obligation is an IDB described in section 103(b)(2). Section 103(b)(4) and (5) provides exemptions for obligations the proceeds of which are to be used to provide specific types of facilities, while section 103(b)(6) does the same for small issues of IDBs, measured by fixed dollar amounts. Section 103(b)(7) exempts the interest from advance refunding issues under limited circumstances. Section 103(b)(8) defines one of the specific exemptions of section 103(b)(4). Finally, section 103(b)(9) denies the benefits of section 103(b)(4) through (7) to substantial users of a facility who hold obligations issued to finance that facility. Thus, it appears that section 103(b) implements the congressional scheme regarding the tax status of IDBs (see p. 555 *infra*) by looking to the uses, users, and source of repayment of the bond proceeds. We now turn to the issues presented in this case.

*1. The Proposed Bonds Would Not Be Obligations of the United States.*

Respondent's basic contention is that the proposed bonds would be obligations of the United States and not petitioner because the funds and credit of the United States, rather than of petitioner, are in substance backing the bonds. To hold that

---

"precursors of IRBs, their use has been relatively infrequent. Congressional Budget Office, Small Issue Industrial Revenue Bonds 1 n.1 (1981) (CBO Study). Sec. 103(b)(2), which defines industrial development bonds, does not draw this distinction, and the regulations hold that this distinction is without tax effects. Sec. 1.103–7(b)(4), Income Tax Regs. We, therefore, shall refer only to IDBs, the statutory term here in issue. We note, however, that the proposed bonds would actually be IRBs."

the bonds would be issued on behalf of an entity described in section 103(a), he argues, would be to exalt form over substance. Petitioner responds that the proposed bonds would not be obligations of the United States in either form or substance. Moreover, petitioner contends that respondent's position was rejected by Congress when it enacted section 103(b).

The heart of the dispute between the parties is whether, in determining the tax-exempt status of obligations, we are to first look to the nominal obligor, i.e., the issuer, or to the "real obligor" (in an economic sense). Respondent contends we should first look to the substance of the transaction; in essence, the United States as opposed to a State or political subdivision would be the real obligor. Thus, according to respondent, the bonds would not be described by section 103(a), and no inquiry under that section would be necessary. Petitioner's position is that since the issuer of the bonds will be an entity described in section 103(a)(1), the tax status of the issue is governed by section 103; the "real obligor" theory may then be applied only as set forth in section 103(b). While at first glance, respondent's "substance over form" argument may be appealing, close scrutiny of the legislative history of section 103(b) dictates that we adopt petitioner's position in dealing with IDBs.

*a. The history of the IDB provisions indicates that Congress limited the "real obligor" theory in determining the tax-exempt status of IDBs.*

The exemption contained in section 103(a)(1) was first successfully used for industrial development by the State of Mississippi in 1936 when that State adopted its "Balance Agriculture with Industry" plan. See Pinsky, "State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach," 111 U. Pa. L. Rev. 265 (1963). Respondent first publicly approved of IDBs in Rev. Rul. 54–106, 1954–1 C.B. 28, in which he determined that bonds which are issued by or in behalf of a municipality for the purpose of constructing industrial plants are tax exempt even though such plants would be leased to private enterprises and the principal and interest on the bonds would only be repaid from the leasing revenues.[6] Rev. Rul. 57–187, 1957–1 C.B. 65,

---

[6]Ironically, only a few days before Rev. Rul. 54–106, 1954–1 C.B. 28, was issued, the House of Representatives passed H.R. 8300, 83d Cong., 2d Sess. (which was to eventually become the Internal Revenue Code of 1954). Sec. 274 of that bill would have disallowed rental deductions for the use of property acquired or improved out of the proceeds of an industrial

extended this tax-exempt treatment to bonds issued by an industrial development board similar to petitioner. See also Rev. Rul. 63–20, 1963–1 C.B. 24.[7]

In 1966, while respondent was still approving the use of IDBs, he attempted to prevent a similar "pass through" use of the tax exemption for certain municipal or State bonds relating to arbitrage (arbitrage bonds). In TIR–840, issued August 11, 1966, he announced that he would decline to issue rulings as to whether such bonds[8] qualified under section 103(a).

On July 24, 1967, Representative John Byrnes introduced H.R. 11645 which would have amended section 103 to exclude from the exemption any future issues of IDBs. After discussing the history of IDBs, he stated that IDBs—

pervert[ ] the tax-exemption privilege enjoyed by State and municipal governments. The exemption privilege * * * was never intended as a means whereby private corporations could borrow money at low interest rates using the governmental unit as an "umbrella." * * * This practice * * * makes a mockery of our tax laws. The tax-exempt status of interest on municipal bonds must be limited to legitimate governmental functions where it is the credit of the municipality that supports the bond not the credit of some second party beneficiary. [113 Cong. Rec. 19877 (1967).][9]

On November 8, 1967, Senator Abraham Ribicoff introduced companion bills to prohibit IDBs and arbitrage bonds which he characterized as "abuses of the tax exempt borrowing privilege * * * undermining the usefulness of this method of helping our State and local governments finance their legitimate

---

development revenue bond. The Senate, while recognizing the problem, subsequently deleted the provision because it required further consideration. S. Rept. 1622, 83d Cong., 2d Sess. 41 (1954).

[7]In Rev. Rul. 63–20, 1963–1 C.B. 24, respondent set forth the requirements for approval of IDBs issued by nonprofit industrial development corporations. Among these requirements were that the State or local Government have a beneficial interest in the nonprofit corporation while the indebtedness remained outstanding and has approved the corporation and each of the specific obligations issued by the corporation.

[8]Arbitrage bonds were and now are used to generate income by investing the proceeds of the tax-exempt obligations (and sometimes securing them by) taxable obligations, generally U.S. securities, yielding a higher interest rate than the arbitrage bonds. By acting as an intermediary, local governmental units receive the arbitrage profit without risk or independent investment. See Hearings on H.R. 15414 Before the Senate Comm. on Finance, 90th Cong., 2d Sess. 90–91 (1968) (Letter from Assistant Secretary of Treasury Stanley Surrey) (hereinafter Senate Hearings).

[9]This was not the first attempt to remove the exemption for IDBs. See, e.g., H.R. 798, 87th Cong., 1st Sess. (1961). See also n. 6 *supra*.

functions at the lowest possible cost." 113 Cong. Rec. 31612 (1967). He added that the IDBs "are truly corporate bonds and the local government's involvement is often little more than a sham." 113 Cong. Rec. 31612, *supra*. Senator Ribicoff then noted the inconsistency in the Government's position of permitting IDBs while effectively prohibiting arbitrage bonds,[10] because in both instances the locality acts as a mere conduit for the interest paid by the "real obligor."

The Treasury Department soon recognized that the Government's position on arbitrage bonds and IDBs "could not stand consistently. One or the other would be wrong, either the 1954 ruling [Rev. Rul. 54–106, *supra*] or the arbitrage ruling." Hearings on H.R. 15414 Before the Senate Comm. on Finance, 90th Cong., 2d Sess. 83 (1968) (Testimony of Assistant Secretary of Treasury Stanley Surrey). In TIR–972, issued March 6, 1968, one week before the Senate Hearings on IDBs, respondent announced that he was reexamining his position that IDBs would be considered obligations within the meaning of section 103(a). Proposed regulations, providing that interest paid on IDBs would no longer be exempt because these bonds were not "obligations of a State * * * or any political subdivision" within section 103(a), since the primary obligor was not a State or political subdivision, were published March 23, 1968. 33 Fed. Reg. 4950 (1968). See also note 20 *infra*.

Following a debate over whether the Treasury's prior position should be reversed by administrative or legislative action,[11] the Senate adopted provisions suspending the proposed regulations and prospectively limiting the use of IDBs. See Conf. Rept. 1533, 90th Cong., 2d Sess. (1968), 1968–2 C.B. 801, 806. The Conference Committee revamped the Senate provisions, and Congress adopted the conference substitute,[12]

---

[10]Respondent's refusal to issue rulings on the tax-exempt status of arbitrage bonds to be issued by State and municipal governments made it impossible, as a practical matter, for these bonds to be issued. Bondholders would not risk the tax-exempt status being subject to question. This problem ultimately resulted in the enactment of sec. 7478. See S. Rept. 95–1263 (1978), 1978–3 C.B. (Vol. 1) 315, 448; H. Rept. 95–1800 (Conf.) (1978), 1978–3 C.B. (Vol. 1) 521, 574.

[11]See, e.g., 113 Cong. Rec. 31613 (1967); Senate Hearings, *supra* at 95–96, 107, 118; S. Rept. 1014, 90th Cong., 2d Sess. (1968), 1968–2 C.B. 790, 794.

[12]Revenue and Expenditure Control Act of 1968, Pub. L. 90–364, sec. 107(a), 82 Stat. 266. This initial IDB provision was added to the Code as sec. 103(c). When the old sec. 103(b) was

which "for the future provided *exclusive* rules for industrial development bonds * * * within the definition contained in the [statute] specifying the types of such bonds which in the future are to be taxable and the types of such bonds which are to be tax exempt." Conf. Rept. 1533, *supra*, 1968–2 C.B. at 806. (Emphasis added.)[13]

The IDB provision in the Revenue and Expenditures Control Act of 1968 contained specific exemptions for facilities which Congress considered to be legitimate functions of local Governments, as well as a very narrow small issue exemption. The latter exemption was limited to issues of $1 million or less of which substantially all of the proceeds were to be used for the acquisition, construction, reconstruction, or improvement of land or depreciable property or the refunding of a prior issue used for those purposes. See Conf. Rept. 1533, *supra*, 1968–2 C.B. at 810–811. Rules were included under which certain prior issues were to be taken into account.

This small issue exemption was soon expanded. As part of the Renegotiation Amendments Act of 1968, the small issue exemption of section 103(b)(6) was raised to $5 million in certain specified circumstances. Pub. L. 90–634, sec. 401, 82 Stat. 1349 (1968). Not only prior issues were to be taken into account in determining whether the spending limitation had been met, but also certain capital expenditures during the 6-year period commencing 3 years prior to date of issue. See Conf. Rept. 1951, 90th Cong., 2d Sess. (1968), 1968–2 C.B. 876, 877–881. The purpose of this amendment "was to provide an exemption which was of sufficient size to allow the issuance of these bonds to aid small businesses in locating in a community." 114 Cong. Rec. 29891 (1968) (Statement of Senator Russell Long). It was designed to prevent large business ventures from receiving these tax benefits; i.e., a person could not use an exempt $5 million issue to construct part of a facility and then

repealed in 1976 (see n. 4 *supra*), sec. 103(c) on IDBs was redesignated sec. 103(b). Unless otherwise indicated, all references to sec. 103(b) refer to the IDB provision.

[13]The report further states that "The conference substitute does not affect the tax status of any obligation which is not an industrial development bond as defined in the substitute." In light of the report's language quoted in the text, we believe that this further language has no effect on the resolution of the instant case. Such further language merely indicates that Congress carved a *specific IDB exception* from the tax-exempt obligation provision without deciding whether that or any other exceptions previously existed and without intending to cast doubt on the exempt status of conventional State and municipal bonds.

use other funds to construct additions or other facilities in the same jurisdiction within the 6-year period. 114 Cong. Rec. 30603 (Oct. 10, 1968) (Statement of Representative Wilbur Mills). The $5 million small issue exemption was raised in 1978 to $10 million in order to take into account the effects of inflation, although the $1 million exception was not similarly raised. Revenue Act of 1978, Pub. L. 95–600, sec. 331(a), 92 Stat 2839; H. Rept. 95–1800 (Conf.) (1978), 1978–3 C.B. (Vol. 1) 521, 569; S. Rept. 95–1263 (1978), 1978–3 C.B. (Vol. 1) 315, 433.

The logical inference drawn from the history of section 103(b) is that while Congress was aware of the true nature of IDBs, i.e., the identity of the "real obligor" (see pp. 552–553 *supra*), it determined in its wisdom that IDBs would be tax exempt under specified conditions. Thus, Congress rejected respondent's wholesale position, set forth in 1968 in his proposed regulations and the congressional hearings and reasserted in the instant case, that the municipal veil should be pierced on the basis that the State or local Government issuing a debt instrument is not the "real obligor." Instead, Congress adopted a modified "real obligor" theory and excluded interest on certain IDBs only to the extent that the proceeds did not inure to what it perceived to be appropriate public purposes, i.e., the exempt activities set forth in section 103(b)(4), (5), and (7), as well as those small issues qualifying within section 103(b)(6). Thus, in our judgment, by having dealt in detail with the tax status of IDBs, Congress preempted the field and effectively precluded any general adoption of the "real obligor" theory as a judicial gloss on section 103—at least insofar as the tax consequences of IDBs, as defined in the statute, are concerned. *Braunstein v. Commissioner*, 374 U.S. 65, 71–72 (1963). See *American Foundation Co. v. Commissioner*, 40 B.T.A. 542 (1939). Cf. *David Metzger Trust v. Commissioner*, 76 T.C. 42 (1981) (dicta); *International State Bank v. Commissioner*, 70 T.C. 173, 180 (1978).

b. *The definition of IDBs in section 103(b) includes IDBs whose proceeds are to be used to finance facilities for the Federal Government.*

Respondent urges us to adopt the position that section 103(b), itself, distinguishes State and local governmental bonds used to finance Federal facilities from IDBs for the benefit of private corporations. He emphasizes that the legislative histo-

ry of the IDB provisions consistently refers to private corporations as the "real obligor" of the IDBs and that the financing of Federal facilities was nowhere mentioned in the Senate hearings and debates. In light of the long-standing policy that the United States will not issue tax-exempt securities without specific legislation to that effect, respondent argues that the United States is the "real obligor" of these bonds and that section 103(b) only applies to IDBs benefiting *private* organizations. Had Congress intended to include these Federal obligations within the provisions of section 103(a), respondent contends, it would have done so explicitly. We think that in many respects this argument is nothing more than a refinement of respondent's basic contention (see pp. 550–551 *supra*) and is equally without merit.

We do not find the absence of discussion of uses by the Federal Government of IDBs in the legislative history persuasive for three reasons. First, we follow the rule of statutory construction that "if Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators." *Burge v. Commissioner*, 28 T.C. 246, 260 (1957), affd. 253 F.2d 765, 769 (4th Cir. 1958), quoting *Barr v. United States*, 324 U.S. 83, 90 (1945). Section 103(b)(2)(A) provides that—

the term "industrial development bond" means any obligation—

(A) which is issued as part of an issue all or a major portion of the proceeds of which are to be used directly or indirectly in any trade or business carried on by any person who is not an exempt person * * *

Unless we were to find that the United States is either not "any person" or is not engaged in "any trade or business," the statutory language would foreclose respondent's argument.[14]

Admittedly, the definition of "person" in section 7701(a)(1) does not explicitly include a Government or an agency of a Government, but it does not exclude them either. See sec. 7701(b). Whether the term "person" includes the Federal

[14]The other requirement in the statutory definition of an IDB, i.e., the so-called "security interest test" (see sec. 103(b)(2)(B)) would clearly be met by the proposed bonds because the payments on the bonds would be derived in major part from the rental payments on the property. This finding is further supported by the provision that the bonds would be called 1 year after the U.S. Government, through GPO, gives notice of its intent to terminate, unless other suitable tenants are obtained.

Government cannot be abstractly declared, but depends upon its legislative environment. *Estate of Wycoff v. Commissioner*, 506 F.2d 1144, 1151 (10th Cir. 1974), affg. 59 T.C. 617, 625 n. 4 (1973). Cf. *Sims v. United States*, 359 U.S. 108, 112 (1959); *Ohio v. Helvering*, 292 U.S. 360, 370 (1934). The legislative purpose behind section 103(b) is to tax the interest from an IDB as if it were issued by the "real obligor" unless it falls within one of the exceptions provided in section 103(b)(4) through (7), or the proceeds will be used by an "exempt person." Had the United States (or GPO), or Springbelt issued the bonds, the interest would be taxable. Moreover, the use of the word "any" preceding and modifying "person" is indicative of a broader construction of "person." Finally, it would be "manifestly incompatible" (see sec. 7701(a)), to state that "person" excludes some branch of Government in our Federal system, when section 103(b)(3)(A) states that "exempt person" means a governmental unit.[15] Thus, we think that the subject matter, the context, and the legislative history indicate that the United States (or an agency thereof) should be included in the term "any person" in section 103(b)(2)(A). See *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 93 (1934).

Similarly, we believe the term "any trade or business" is broad enough to include the activities of the Federal Government. While a narrow construction of "trade or business" might be appropriate in determining the deductibility of business expenses (sec. 162(a)) or interpreting the scope of a charitable organization's exemption from tax (see, e.g., sec. 1.513–1(b), Income Tax Regs.), it would not be so here. Again, the use of the word "any" preceding "trade or business" is indicative of a broader construction of the entire phrase. See above. We therefore conclude that the definition of IDBs in section 103(b)(2) does include bonds otherwise meeting the definition whose proceeds are to be used by (an agency of) the United States.[16]

---

[15]We recognize that "governmental unit," as used in sec. 103(b)(3)(A), has a limited meaning. See sec. 1.103–7(b)(2), Income Tax Regs., and pp. 559–561 *infra*. Nonetheless, given the policy behind sec. 103(b) and the use of the modifier "any" as opposed to "exempt," we believe this construction of "person" is appropriate.

[16]Were we to conclude that the United States either was not "any person" or not engaged in "any trade or business," respondent would not necessarily prevail. Whether an IDB

Second, we find the silence in the legislative history regarding uses by the Federal Government of IDBs to be as consistent with petitioner's view of the statute as with the view urged by respondent. The basic thrust of section 103(b) is to codify the "real obligor" theory but with specified modifications and exceptions. In terms of who is a "real obligor," that section draws no distinction between bonds of the United States as opposed to those of a private corporation, and we see no basis for concluding that such a distinction should be judicially constructed. The fact of the matter is that, although there has been a long-standing policy that the United States will not issue tax-exempt bonds, there has been an even longer standing policy that corporate or noncorporate business entities may not issue tax-exempt bonds, either. Compare section 61(a)(4) of the Code with section II(B) of the Revenue Act of 1913, Pub. L. 63–16, 38 Stat. 167.[17]

Finally, respondent's construction of the statute and its legislative history is inconsistent with the analogous history and structure of section 103(c) governing arbitrage bonds. In the case of section 103(b), the focus was on private uses, yet, generic language broad enough to include bonds for the benefit of the Federal Government was used.[18] Although section 103(c) was not enacted until a year later, the need for such a provision was discussed at the same time that the IDB statute was considered and enacted. See pp. 552–553 *supra*. The legislative concern behind section 103(c) was to prevent local Governments from issuing bonds whose proceeds were to be invested in higher yielding securities of the United States. See note 8 *supra*. In both cases, Congress attacked the general problem rather than the narrow, triggering incidents upon which its concerns were based, in order to prevent the erosion of the Federal tax base and protect the market for genuine State and municipal bonds. See Note, "The Limited Tax-Exempt Status of Interest on Industrial Development Bonds

---

should be denied exempt status on the "real obligor" theory has never been decided by this or any other court, prior to the enactment of sec. 103(b). Furthermore, it is possible that Congress in enacting sec. 103(b) has completely preempted the use of this theory with respect to revenue bonds generally and not just IDBs. Cf. p. 555 *supra*.

[17]See also the Act of Aug. 27, 1894, ch. 349, sec. 28, 28 Stat. 553; Act of July 1, 1862, ch. 119, secs. 90–91, 12 Stat. 473. Cf. Act of Aug. 5, 1861, ch. 45, sec. 49, 12 Stat. 309.

[18]See pp. 556–557 *supra*.

Under Subsection 103(c) of the Internal Revenue Code," 85 Harv. L. Rev. 1649 (1972); H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 308. Thus, Congress' choice of language, broad enough to encompass uses of the IDBs by the Federal Government, would appear to have been deliberate; at the very least, we are not convinced that Congress would have or did reject such a possibility. Consequently, we hold that IDBs whose proceeds are to be used to finance facilities for the Federal Government are covered by section 103(b).

*2. Neither the Federal Government Nor the GPO Is an "Exempt Person" Within the Meaning of Section 103(b)(3).*

The next issue to be resolved is whether the U.S. Government or the GPO is an "exempt person" within the meaning of section 103(b)(3).[19] If the relevant entity is found to be such an exempt person, as petitioner contends, then the proposed bonds would not be industrial development bonds by definition because section 103(b)(2)(A) limits the definition to bonds whose proceeds are to be used in any trade or business of a person who is *not* an "exempt person."

Section 1.103–7(b)(2), Income Tax Regs., interprets the statutory term "governmental unit" as follows—

For purposes of this subparagraph, the term "governmental unit" means a State or local governmental unit (as defined in sec. 1.103–1). For purposes of this subparagraph, the term "governmental unit" also includes the United States of America (or an agency or instrumentality of the United States of America) but only in the case of obligations (i) issued on or before August 3, 1972, or (ii) issued after August 3, 1972, with respect to which a bond resolution or any other official action was taken and in reliance on such action either (*a*) construction of such facility to be financed with such obligations commenced or (*b*) a binding contract was entered into, or an irrevocable bid was submitted, prior to August 3, 1972, or (iii) issued after August 3, 1972, with respect to a program approved by Congress prior to such date but only if (*a*) a portion of such program has been financed by obligations issued prior to such date, to which section 103(a) applied pursuant to a ruling issued by the Commissioner or his delegate prior to such date, and (*b*) construction of one or more facilities comprising a part of such program commenced prior to such date. * * * [20]

---

[19]Sec. 103(b)(3) defines the term "exempt person" for purposes of the trade or business test of sec. 103(b)(2)(A) as—

(A) a governmental unit, or

(B) an organization described in section 501(c)(3) * * *

[20]The initial regulations proposed under the new IDB provision of the Code would have excluded the Federal Government from the term "governmental unit." 34 Fed. Reg. 508, 509

Section 1.103–1(a), Income Tax Regs., defines a "State or local governmental unit" as including "a State, territory, a possession of the United States, the District of Columbia, or any political subdivision thereof." Thus, petitioner's position in this case may not be sustained if the applicable regulation is valid.

We must defer to those regulations which implement the congressional mandate in some reasonable manner; unless they are unreasonable and plainly inconsistent with the revenue statutes, the regulations must be sustained. *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 170 (1981, 47 AFTR 2d 81–855, 81–861, 81–1 USTC par. 9219). In light of the history of this section, we find not only that respondent's interpretation is reasonable, but also that it clearly implements the congressional mandate.

Petitioner's argument that the regulation is invalid relies upon the broad interpretation given section 103(a) prior to the proposed regulations leading to the enactment of section 103(b).[21] See, e.g., *Commissioner v. Shamberg's Estate*, 144 F.2d 998 (2d Cir. 1944), affg. 3 T.C. 131 (1944); *Independent Gravel Co. v. Commissioner*, 56 T.C. 698 (1971), and cases cited therein. See also the revenue rulings discussed at p. 552 *supra*. The focus in these cases and rulings was not on the use or user of the bond proceeds, but on whether the bonds were in fact issued by or on behalf of a political subdivision. Cf. Spiegel, "Financing Private Ventures with Tax-Exempt Bonds: A Developing 'Truckhole' in the Tax Law," 17 Stan. L. Rev. 224, 229 (1965).

Section 103(b), however, implements the real obligor theory by adopting it only in modified form in which the focus of inquiry is shifted from the simple question of who is the issuer to a more complex question which takes into account the uses and users of the proceeds of a bond issue. See p. 550 *supra*. Any

---

(Jan. 14, 1969). Subsequent proposed regulations reversed this position, including the "United States of America/or an agency or instrumentality of the United States of America" within its meaning. 36 Fed. Reg. 10953, 10955 (June 5, 1971). The final regulations, removing the United States from within the term "governmental unit," grandfathered those bonds issued in reliance on the prior proposed regulations. T.D. 7199, 1972–2 C.B. 45, 49 (1972).

[21]Sec. 1.103–7, Proposed Regs., 33 Fed. Reg. 4950 (1968).

debt obligation whose proceeds are to be used directly or indirectly by a nonexempt person, and which satisfies both the trade or business test (see sec. 103(b)(2)(A)) and the security interest test (see sec. 103(b)(2)(B)) is an IDB. Conf. Rept. 1533, *supra,* 1968–2 C.B. at 807; see pp. 556–558 *supra.*

Although the statute does not define "governmental unit," we are convinced that the regulations properly interpret the term. The term was used in the proposed regulations leading to the statute and limited to those entities described in section 103(a)(1).[22] More importantly, the committee which drafted the provision presumed the term would be so limited. Conference Report 1533, *supra,* states—

Paragraph (3) of new section 103([b]) defines the term "exempt person" for purposes of paragraph (2)(A) to mean—

(1) a governmental unit (that is, a State, a territory, or a possession of the United States, or any political subdivision of any of the foregoing, or of the District of Columbia) * * * [1968–2 C.B. at 807.]

Cf. *Bingler v. Johnson,* 394 U.S. 741, 754–755 (1969).[23] Finally, the policy behind section 103(b), to look at the "real obligor," but on a modified basis and within specified exceptions and limitations, is fully consistent with excluding the Federal Government from the term "governmental unit" for purposes of that section because its bonds would not be tax exempt. In any event, we clearly cannot find such a regulation to be unreasonable or inconsistent with the statute and we therefore must uphold its validity. See p. 560 *supra.* Thus, we find that the proposed bonds fit within the definition of an IDB contained in section 103(b)(2).

3. *The Capital Expenditures of the Entire United States Government in Fairfax County Are To Be Aggregated With Those of This Project for Purposes of the $10 Million Small Issue Exemption.*

The proposed bonds might still avoid IDB treatment (and

---

[22]We note that the Conference Committee rewrite of the IDB provision passed by the Senate resembles the initial proposed regulation as much as it does the Senate bill, although it expanded upon both in exempting uses by sec. 501(c)(3) exempt organizations and certain small issues. Most of the examples in the Conference report are virtually identical to those in the proposed regulations. Compare 1968–2 C.B. at 808–809 with 33 Fed. Reg. at 4951.

[23]Subsequent attempts to "clarify" the statutory term "exempt person" so as to include the Federal Government were unsuccessful. See, e.g., S. 2280, 91st Cong., 1st Sess.; H.R. 12923, 91st Cong., 1st Sess.

thus be tax exempt) if they fit within the exemption for small issues contained in section 103(b)(6). In particular, petitioners claim that their proposed issue falls within the $10 million small issue exemption of section 103(b)(6)(D).[24] Since the parties do not dispute that either the United States or GPO will be the "principal user" (see sec. 103(b)(6)(E)(ii)) of the facility and have stipulated to the level of expenditures, the remaining issue is whether the United States and GPO are separate, related, or one and the same "person" under section 103(b)(6)(C). Petitioner asserts that the U.S. Government and the GPO are not "related persons" within the definition set forth in section 103(b)(6)(C),[25] and consequently concludes that their capital expenditures should not be aggregated.

We think petitioners have missed the mark. If an unincorporated division of a corporation had been the lessee of this facility, we would not reach the issue of whether it was a "related person" to that corporation; they would be parts of the same "person." This is the analogy to be drawn in the instant case because the GPO is part of the U.S. Government. 44 U.S.C. sec. 301 et seq. (1976).

The rationale behind subsections 103(b)(6)(C) and (D), in particular, supports our conclusion. The underlying purpose of section 103(b)(6)(C) is clearly to aggregate rather than separate intertwined entities. We think Congress did not include branches of a "person" within the definition of "related persons" because they were already considered to be one and the same. The alternative would open a loophole which was neither intended nor expressed in the statute, especially in light of the careful drafting whereby Congress attempted to withhold the benefits of section 103(b)(6)(D) from large business ventures. See pp. 554–555 *supra*.

---

[24]Petitioner, in its ruling request, stated its intention to elect the applicability of this exemption.

[25]Sec. 103(b)(6)(C) provides—

(C) RELATED PERSONS.—For purposes of this paragraph and paragraph (7), a person is a related person to another person if—

(i) the relationship between such persons would result in a disallowance of losses under section 267 or 707(b), or

(ii) such persons are members of the same controlled group of corporations (as defined in section 1563(a), except that "more than 50 percent" shall be substituted for "at least 80 percent" each place it appears therein).

Moreover, this reading is consistent with the *general* rationale behind section 103(b) and (c), i.e., to look to the economic realities of whose credit is supporting the obligation and then tax the obligation accordingly. See pp. 552–553 *supra*. In the instant case, regardless of whether we consider the GPO or the entire Federal Government to be the lessee of the facility,[26] it is evident that it is the U.S. Government which would ultimately be liable for the rent.

Petitioners argue that respondent has implicitly conceded that the United States is a separate person from its agencies and instrumentalities in section 1.103–7(b)(2), Income Tax Regs., which states, in part, "the term 'governmental unit' also includes the United States of America (or an agency or instrumentality of the United States of America)," due to the first use of the word "or" in the parenthetical. We reject petitioner's argument. Given the limited purpose of this provision in the regulation (see pp. 559–560 and note 20 *supra*), we think the parenthetical was designed to clarify the definition of the United States of America, rather than to expand upon it.

Finally, petitioner argues that the separation of powers doctrine prevents aggregation among branches of the Federal Government, and that we therefore should aggregate only the capital expenditures of the legislative branch. Suffice it to say that the checks and balances involved in the separation of powers doctrine were designed "to preclude the exercise of arbitrary power * * * by means of the inevitable friction incident to the distribution of the governmental powers among three departments" (*Myers v. United States*, 272 U.S. 52, 293 (1926) (Justice Brandeis dissenting), quoted with approval in *Nixon v. Sirica*, 487 F.2d 700, 715 n. 73 (D.C. Cir. 1973)),[27] and are unrelated to the Federal fisc. The aggregation of the capital expenditures of the different branches of the Federal Government crosses no barriers established by the separation of powers doctrine, and petitioner's argument to the contrary is plainly without merit.

---

[26]See p. 547 *supra*. Although the United States was on the printed form as lessee, it was understood that the GPO would be occupying the facility.

[27]See generally The Federalist No. 47 (J. Madison).

In conclusion, we hold that the proposed bonds would be industrial development bonds not eligible for the small issue exemption of section 103(b)(6).

*Decision will be entered for the respondent.*

Reviewed by the Court.