CITY OF TUCSON, ARIZONA, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3889–80B.     Filed April 29, 1982.

*Charles E. James, Jr.,* and *John C. Wesley,* for the petitioner.[1]

*L. Michael Wachtel,* for the respondent.

---

[1] A brief was filed by Manly W. Mumford and David H. Nelson, representing the city of Phoenix, Ariz., as amicus curiae.

## OPINION

FEATHERSTON, *Judge*: This is an action for declaratory judgment filed pursuant to section 7478.[2] On June 29, 1979, the city of Tucson, Ariz. (hereinafter petitioner or the city), requested respondent to rule that bonds in the amount of $1 million which petitioner proposes to issue will be obligations described in section 103(a)(1), so that the interest thereon will be excludable from the bond owners' gross income. After lengthy administrative review, respondent denied the request, and this declaratory judgment action was filed. All jurisdictional requirements have been met. See Rule 210(c), Tax Court Rules of Practice and Procedure.

In declining to rule that interest on the proposed bonds will be tax exempt under section 103(a)(1), respondent concluded that the bonds "will be arbitrage bonds within the meaning of section 103(c)(2)(B), so that the Bonds will not be treated as obligations described in section 103(a)." Petitioner asks us to make a declaration under section 7478 that the proposed obligations are described in section 103(a)(1). Basing our decision on the administrative record, we hold for respondent.

## 1. Basic Facts

The proposed $1 million bond issue here in controversy will be the fifth series of bonds issued by the city pursuant to an authorization given at a city election in 1973. At that election, the city was authorized to issue general obligation bonds in the total principal amount of $40,400,000 (sometimes referred to as the project of 1973 bonds) to provide for various public improvements. State law requires that, after general obligation bonds are issued, the city must annually levy and collect an ad valorem property tax in an amount sufficient to pay the principal of, and the interest on, the bonds when due; further, the city must keep such tax moneys in a distinct fund for payment of the bond principal and interest. Ariz. Rev. Stat. Ann. sec. 35–458 (1974). The city may use any legally available moneys to pay debt service on its general obligation bonds, but

---

[2]All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise noted.

the ad valorem property tax is the only pledged source of payment for such bonds.

The first series of the project of 1973 bonds[3] in the amount of $14,145,000 was sold in May 1973 to provide for street lighting, police and fire facilities, libraries, sewers, and recreational facilities. These bonds were scheduled to mature at the rate of $25,000 each year from 1974 through 1991, with the remaining $13,695,000 maturing in 1992. The third series of the project of 1973 bonds in the amount of $2,400,000 was sold in January 1977 to provide for improvements to street storm sewers. This third series was scheduled to mature in the years 1990, 1991, and 1992 at the rate of $800,000 per year. The proposed fifth series in the amount of $1 million is to be used to construct lighting and improvements for the public streets of the city. This series will mature in 1993 and 1994 at the rate of $500,000 each year.[4]

---

[3]The first and third as well as the proposed fifth series of the Project of 1973 bonds are relevant to the present controversy because, as we shall discuss, all three of these series are payable from a common sinking fund. The second series of the project of 1973 bonds in the amount of $10,235,000 was sold in March 1975. This series had a sinking fund requirement which provided for its repayment in the years 1987 through 1989. However, the second series was refunded through the issuance of general obligation refunding bonds. Amounts raised from taxes levied to pay the refunding bonds were placed in a fund separate from the sinking fund created to pay the project of 1973 bonds. The fourth series of the project of 1973 bonds in the amount of $1 million was sold in June 1978. These bonds were not made payable from a sinking fund. For this series, the moneys to pay principal and interest are to be collected in the year the principal and interest are due to be paid.

[4]The following table sets forth the maturity dates of the three relevant bond issues:

BOND MATURITIES

| Fiscal year | First series $14,145,000 1973 | Third series $2,400,000 1977 | Proposed fifth series $1,000,000 | Total |
|---|---|---|---|---|
| 1973–74 | $25,000 | 0 | 0 | $25,000 |
| 1974–75 | 25,000 | 0 | 0 | 25,000 |
| 1975–76 | 25,000 | 0 | 0 | 25,000 |
| 1976–77 | 25,000 | 0 | 0 | 25,000 |
| 1977–78 | 25,000 | 0 | 0 | 25,000 |
| 1978–79 | 25,000 | 0 | 0 | 25,000 |
| 1979–80 | 25,000 | 0 | 0 | 25,000 |
| 1980–81 | 25,000 | 0 | 0 | 25,000 |
| 1981–82 | 25,000 | 0 | 0 | 25,000 |
| 1982–83 | 25,000 | 0 | 0 | 25,000 |
| 1983–84 | 25,000 | 0 | 0 | 25,000 |
| 1984–85 | 25,000 | 0 | 0 | 25,000 |
| 1985–86 | 25,000 | 0 | 0 | 25,000 |
| 1986–87 | 25,000 | 0 | 0 | 25,000 |
| 1987–88 | 25,000 | 0 | 0 | 25,000 |

The first series of bonds is subject to a call provision permitting their retirement prior to maturity, on July 1, 1978, or any interest payment date thereafter,[5] by payment of all principal and accrued interest plus a call premium specified by a formula. Similarly, the third series of bonds contains a call provision permitting their early retirement (in reverse numerical order) through payment of principal and accrued interest plus a call premium. It is expected that the proposed fifth series bonds will also be subject to a call provision, the terms of which have yet to be established.

In connection with the issuance of the first series of the project of 1973 bonds, petitioner provided for a sinking fund into which moneys from taxes are to be deposited each year for the payment of the principal of and interest on the bonds when due. Provision was made for expanding the sinking fund for the first series to secure other series as they were issued. Deposits into the sinking fund are to cease when the fund contains money or investments sufficient to pay all amounts to become due on the bonds. Pending their use to make these payments, the city expects to invest the sinking fund moneys in obligations not described in section 103(a) which will return yields one or more percentage points higher than the yield on the project of 1973 bonds. None of the amounts borrowed (i.e., the direct proceeds of the bonds) are deposited into the sinking fund; such borrowed amounts are held in a separate fund and used to make the public improvements for which the bonds were voted.

Deposits have been made into the sinking fund created in connection with the first series to cover the interest and the principal payable under that series and the third series. Deposits will be made into this sinking fund to cover the

| 1988–89 | $25,000 | 0 | 0 | $25,000 |
|---|---|---|---|---|
| 1989–90 | 25,000 | $800,000 | 0 | 825,000 |
| 1990–91 | 25,000 | 800,000 | 0 | 825,000 |
| 1991–92 | 13,695,000 | 800,000 | 0 | 14,495,000 |
| 1992–93 | 0 | 0 | $500,000 | 500,000 |
| 1993–94 | 0 | 0 | 500,000 | 500,000 |
| | 14,145,000 | 2,400,000 | 1,000,000 | 17,545,000 |

[5]Interest on the first series bonds is payable semiannually on the first days of January and July in each year during the term of the bonds. First series bonds maturing prior to July 1, 1979, were noncallable.

principal and interest on the new fifth series here in controversy.[6]

## 2. Contentions of the Parties

Section 103(a)(1)[7] provides generally that gross income does not include interest on the obligations of a political subdivision of a State. The city is, of course, a political subdivision of the State of Arizona, and the proposed bonds will be obligations of the city. The proposed bonds, thus, clearly fall within the general language of section 103(a)(1). That language is qualified, however, by other provisions of section 103.

In denying that interest on the city's proposed bonds will be eligible for tax-free treatment under section 103(a)(1), respondent relies upon section 103(c), providing in pertinent part as follows:

---

[6]The following table shows the amounts required to be deposited into the sinking fund annually, from taxes and other revenues, for the payment of principal on the bonds:

| Fiscal year | First series $14,145,000 1973 | Third series $2,400,000 1977 | Proposed fifth series $1,000,000 | Total |
|---|---|---|---|---|
| 1973–74 | $800,000 | 0 | 0 | $800,000 |
| 1974–75 | 945,000 | 0 | 0 | 945,000 |
| 1975–76 | 950,000 | 0 | 0 | 950,000 |
| 1976–77 | 700,000 | 0 | 0 | 700,000 |
| 1977–78 | 700,000 | $240,000 | 0 | 940,000 |
| 1978–79 | 700,000 | 240,000 | 0 | 940,000 |
| 1979–80 | 700,000 | 240,000 | 0 | 940,000 |
| 1980–81 | 700,000 | 240,000 | $25,000 | 965,000 |
| 1981–82 | 700,000 | 240,000 | 75,000 | 1,015,000 |
| 1982–83 | 700,000 | 240,000 | 75,000 | 1,015,000 |
| 1983–84 | 700,000 | 240,000 | 75,000 | 1,015,000 |
| 1984–85 | 700,000 | 240,000 | 75,000 | 1,015,000 |
| 1985–86 | 700,000 | 240,000 | 75,000 | 1,015,000 |
| 1986–87 | 700,000 | 240,000 | 75,000 | 1,015,000 |
| 1987–88 | 750,000 | 0 | 75,000 | 825,000 |
| 1988–89 | 750,000 | 0 | 75,000 | 825,000 |
| 1989–90 | 750,000 | 0 | 75,000 | 825,000 |
| 1990–91 | 750,000 | 0 | 75,000 | 825,000 |
| 1991–92 | 750,000 | 0 | 75,000 | 825,000 |
| 1992–93 | 0 | 0 | 75,000 | 75,000 |
| 1993–94 | 0 | 0 | 75,000 | 75,000 |
| | 14,145,000 | 2,400,000 | 1,000,000 | 17,545,000 |

[7]SEC. 103. INTEREST ON CERTAIN GOVERNMENTAL OBLIGATIONS.

(a) GENERAL RULE.—Gross income does not include interest on—

(1) the obligations of a State, a Territory, or a possession of the United States, or any political subdivision of any of the foregoing, or of the District of Columbia; * * *

SEC. 103(c). ARBITRAGE BONDS.—

(1) SUBSECTION (a)(1) * * * NOT TO APPLY.—Except as provided in this subsection, any arbitrage bond shall be treated as an obligation not described in subsection (a)(1) * * *

(2) ARBITRAGE BOND.—For purposes of this subsection, the term "arbitrage bond" means any obligation which is issued as part of an issue all or a major portion of the proceeds of which are reasonably expected to be used directly or indirectly—

(A) to acquire securities (within the meaning of section 165(g)(2)(A) or (B)) or obligations * * * which may be reasonably expected at the time of issuance of such issue, to produce a yield over the term of the issue which is materially higher (taking into account any discount or premium) than the yield on obligations of such issue, or

(B) to replace funds which were used directly or indirectly to acquire securities or obligations described in subparagraph (A).[8]

\*      \*      \*      \*      \*      \*      \*

(6) REGULATIONS.—The Secretary shall prescribe such regulations as may be necesary to carry out the purposes of this subsection.

More specifically, respondent relies upon section 103(c)(2)(B) which defines the term "arbitrage bond" to include any obligation if its proceeds are "reasonably expected" to be used "directly or indirectly" to replace funds which were used to acquire materially higher yielding securities. That Code

---

[8]The breadth of this definition of "arbitrage bonds" is qualified by an exception and by special rules contained in sec. 103(c)(3) and (4) as follows:

(3) EXCEPTION.—Paragraph (1) shall not apply to any obligation—

(A) which is issued as part of an issue substantially all of the proceeds of which are reasonably expected to be used to provide permanent financing for real property used or to be used for residential purposes for the personnel of an educational organization described in section 170(b)(1)(A)(ii) which grants baccalaureate or higher degrees, or to replace funds which were so used, and

(B) the yield on which over the term of the issue is not reasonably expected, at the time of issuance of such issue, to be substantially lower than the yield on obligations acquired or to be acquired in providing such financing.

This paragraph shall not apply with respect to any obligation for any period during which it is held by a person who is a substantial user of property financed by the proceeds of the issue of which such obligation is a part, or by a member of the family (within the meaning of section 318(a)(1)) of any such person.

(4) SPECIAL RULES.—For purposes of paragraph (1), an obligation shall not be treated as an arbitrage bond solely by reason of the fact that—

(A) the proceeds of the issue of which such obligation is a part may be invested for a temporary period in securities or other obligations until such proceeds are needed for the purpose for which such issue was issued, or

(B) an amount of the proceeds of the issue of which such obligation is a part may be invested in securities or other obligations which are part of a reasonably required reserve or replacement fund.

The amount referred to in subparagraph (B) shall not exceed 15 percent of the proceeds of the issue of which such obligation is a part unless the issuer establishes that a higher amount is necessary.

section is implemented by section 1.103–13(g), Income Tax Regs., which provides in part:

(1) *In general.* Amounts held in a sinking fund for an issue (and receipts from investment of the sinking fund) are treated as proceeds of the issue.

(2) *Sinking fund.* The term "sinking fund" includes a debt service fund, redemption fund, reserve fund, replacement fund, or any similar fund, to the extent that the issuer reasonably expects to use the fund to pay principal or interest on the issue.[9]

Petitioner recognizes that the regulations, if valid, remove the proposed bonds from the benefits of section 103(a)(1),[10] but it contends that the regulations go beyond the statute and, therefore, are not valid. The issue to be decided, then, turns on the validity of section 1.103–13(g)(1) and (2), Income Tax Regs. (sometimes referred to hereinafter as the sinking fund regulations).[11]

In testing the validity of these regulations, we are reminded that the Supreme Court has taught that, in cases such as this one, the role of the judiciary "begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable

---

[9]The legal theory underlying this regulation was explained in Rev. Rul. 78–349, 1978–2 C.B. 97, 98, as follows:

"The sinking fund rules of section 1.103–13(g) * * * of the * * * regulations implement the replacement rule of section 103(c)(2)(B) of the Code. Under this rule, bond proceeds are used indirectly to replace amounts held in a sinking fund. Thus (except as provided in certain special rules relating, for example, to temporary periods), amounts held in a sinking fund are subject to the same yield restrictions and have the same status as bond proceeds. They are, for all relevant purposes, 'treated as proceeds.'"

[10]The effective date of the regulations, May 31, 1979, renders them inapplicable to the first and third series bonds. See 44 Fed. Reg. 32657 (1979).

[11]Respondent argues that a proportionate part of the balance in the existing common sinking fund for the first, third, and proposed series of the project of 1973 bonds should be allocated to the proposed series, with the result that the city already has on hand and invested in higher yielding securities approximately $450,973 of the $1 million to be obtained from the proposed issue. Respondent arrives at that conclusion by relying upon sec. 1.103–13(g)(6), Income Tax Regs., which is as follows:

(6) *Allocation.* A sinking fund for two or more issues must be allocated between the issues either–

(i) In proportion to their original face amounts, or

(ii) According to the total amount of debt service on the issues that will actually be paid from the sinking fund.

We agree with petitioner that to accept this argument would permit respondent to lift himself by his own bootstraps. The question of whether the proposed fifth series will be arbitrage bonds turns on whether the revenues collected for repayment of the proposed fifth series bonds and held in the sinking fund should be "treated as proceeds" of the issue under sec. 1.103–13(g)(1) and (2), Income Tax Regs.

manner." *United States v. Correll,* 389 U.S. 299, 307 (1967). Accord, e.g., *Rowan Cos. v. United States,* 452 U.S. 247, 252 (1981); *Commissioner v. Portland Cement Co. of Utah,* 450 U.S. 156, 169 (1981). In other words, the regulation in question "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948). Our task, then, is to examine the reasonableness of the regulation in the light of available evidence as to the will of Congress.

### 3. Legislative History of Section 103(c)

Respondent argues that the sinking fund regulations accord with the congressional purpose of section 103(c) to prevent municipalities from earning significant arbitrage profits.[12] Petitioner, on the other hand, maintains that the legislative history of section 103(c) "demonstrates that it was enacted to deal with a particular type of transaction very different from that proposed by the City." Petitioner contends that, in enacting section 103(c), Congress was addressing "only those situations where investment profit is the motive for issuing the obligations and receipt of the amounts realized upon the sale of the obligations enables the issuer to invest."

Section 103(c) was enacted as part of the Tax Reform Act of 1969, Pub. L. 94–455, 90 Stat. 1765,[13] For several years prior to that enactment, the Treasury Department had been concerned with the status of "arbitrage bonds." In 1966, the Treasury Department announced in T.I.R. 840 (Aug. 11, 1966), Stand. Fed. Tax Rept., par. 6701 (CCH 1966), that it would not issue advance rulings concerning the status of municipal or State bonds in cases in which—

a principal purpose is to invest the proceeds of the tax-exempt obligations in taxable obligations, generally United States Government securities, bearing

---

[12]In this connection, it should be noted that sec. 1.103–13(g)(1) and (2), Income Tax Regs., is qualified by several other provisions. Under sec. 1.103–13(b)(1)(ii), Income Tax Regs., obligations are not arbitrage bonds unless, inter alia, more than 15 percent of the issue is used to replace funds used to acquire materially higher yielding obligations. Further, similar to sec. 103(c)(4), the regulations provide special rules pertaining to the temporary unrestricted investment of amounts deposited in a sinking fund. Sec. 1.103–14, Income Tax Regs.

[13]The congressional deliberations which led to the enactment of sec. 103(c) were recently reviewed in some detail in *State of Washington v. Commissioner,* 77 T.C. 656, 666–668 (1981), on appeal (D.C. Cir., Dec. 22, 1981).

a higher interest yield. The profit received by the governmental units on the difference between the interest paid on the tax-exempt obligations and the interest earned on the taxable obligations is in the nature of arbitrage.

## T.I.R. 840 described two categories of arbitrage bonds:

1. Where all or a substantial part of the proceeds of the issue (other than normal contingency reserves such as debt service reserves) are only to be invested in taxable obligations which are, in turn, to be held as security for the retirement of the obligations of the governmental unit.

2. Where the proceeds of the issue are to be used to refund outstanding obligations which are first callable more than five years in the future, and in the interim, are to be invested in taxable obligations held as security for the satisfaction of either the current issue or the issue to be refunded.

Subsequent to the issuance of T.I.R. 840, bills were introduced in both the House and the Senate to remove arbitrage bonds from the exemption provided by section 103(a). See H.R. 11757 and S. 2636, 90th Cong., 1st Sess. (1967). Upon introducing H.R. 11757, Representative John Byrnes stated as follows (113 Cong. Rec. 20,033 (daily ed. July 25, 1967)):

The mechanics of an arbitrage bond are simple. A State or local government issues bonds and agrees to invest the proceeds in Federal bonds which are then placed in escrow for the payment of interest and principal on the State or local bonds. The investor in these bonds has a certificate which represents neither more nor less than an interest in Federal bonds, but because the interest payments made by the Federal Government pass through the hands of the State or local government it is argued that the interest is exempt. The local government thus makes a profit from the interest differential that exists between the taxable Federal securities and the nontaxable securities which it purports to issue.

* * * Arbitrage bonds really represent an agreement by the issuer to act as a conduit or trustee for passing interest on Federal bonds to private persons and they are not "obligations" of a State or local government within the meaning of existing law. * * *

A similar statement concerning S. 2636 was made by Senator Abraham Ribicoff (113 Cong. Rec. 31,613 (1967)).

Neither H.R. 11757 nor S. 2636 became law, but the House of Representatives inserted a provision in the bill that ultimately became the Tax Reform Act of 1969 to the effect that, "Under regulations prescribed by the Secretary, * * * any arbitrage obligation shall be treated as an obligation not described" in section 103(a)(1).[14]

---

[14]H. Rept. 91–413, at 173 (1969), 1969–3 C.B. 308, explained this provision as follows:

"Some State and local governments have misused their tax exemption privilege by engaging in arbitrage transactions in which the funds from tax-exempt issues are employed

In hearings before the Senate Finance Committee, the Treasury Department advised in a statement by Assistant Secretary Cohen that it favored the House bill's denial of tax exemption to so-called arbitrage bonds but that "the scope of the term 'arbitrage obligation' should be described with some further particularity in the bill." Hearings on H.R. 13270 Before the Senate Comm. on Finance, 91st Cong., 1st Sess. (Part 1) 619 (1969). The Senate ultimately adopted a provision almost identical to the finally enacted section 103(c). The Senate explained its amendment of the House bill in S. Rept. 91–552, at 219–220 (1969), 1969–3 C.B. 562, as follows:

*Explanation of provision.*—Both the House bill and the committee amendments make provision for the taxation of arbitrage bonds issued by State or local governments. The House bill provided that, under regulations prescribed by the Secretary of the Treasury or his delegate, any arbitrage obligation was not to be treated as a tax-exempt State or local government bond. It was contemplated that the regulations issued by the Secretary of the Treasury would provide rules for the temporary investment of proceeds from the State or local government obligation pending their expenditure for the governmental purpose which gave rise to the issue.

The committee amendments also provide that arbitrage bonds are not to be treated as tax-exempt State or local government issues. However, under the committee amendments, arbitrage bonds are defined. They are in general defined as obligations issued where all or a major part of the proceeds can be reasonably expected to be used (directly or indirectly) to acquire securities or obligations which may be reasonably expected, at the time of the issuance of the State or local obligation, to produce a yield which is materially higher than the yield of the State or local governmental bond issue. Arbitrage bonds are also defined as including obligations issued to replace funds which were used to acquire (directly or indirectly) the type of securities or obligations referred to above.[15]

---

to purchase higher yielding Federal obligations whose interest is not taxed in their hands. The tax-exempt issue in these cases generally specifies that the interest on the Federal bonds will be used to service the State and local securities. An individual who purchases a State or local security under such an arbitrage arrangement has the advantage of a tax-exempt security with the safety of a Federal security. The Federal Government then finds itself in the position of becoming an unintended source of revenue for State and local governments while losing the opportunity to tax the interest income from its own taxable bond issues. * * * "

The report also pointed out that, in addition to causing a loss of Federal revenue, arbitrage bonds tend to increase public borrowing costs and crowd out weaker public borrowers. ·

[15]In explaining the general reasons for adopting such a provision, the Senate used

It is true, as the city emphasizes, that Congress did not specifically consider the invested sinking fund in its deliberations concerning section 103(c). However, the legislative history which we have summarized evinces a legislative purpose to broaden the scope of the provision beyond the relatively narrow categories specifically described in T.I.R. 840, which initially prompted congressional action. As was recently stated in *Fairfax Co. Econ. Dev. Auth. v. Commissioner*, 77 T.C. 546, 558 (1981), on appeal (D.C. Cir., Oct. 8, 1981):

The legislative concern behind section 103(c) was to prevent local Governments from issuing bonds whose proceeds were to be invested in higher yielding securities of the United States. * * * [However,] Congress attacked the general problem rather than the narrow,. triggering incidents upon which its concerns were based, in order to prevent the erosion of the Federal tax base and protect the market for genuine State and municipal bonds. * * *

In *State of Washington v. Commissioner*, 77 T.C. 656, 668–669 (1981), on appeal (D.C. Cir., Dec. 22, 1981), this Court said:

There is no indication in the legislative history of why Congress did not confine section 103(c) within a "conduit" frame of reference [see Representative Byrnes' statement, *supra*]. It is entirely possible that Congress, recognizing that its primary objective should be to eliminate the "profit" element which permeated the use of arbitrage bonds, did not want to dilute the accomplishment of that objective by excluding bonds not * * * secured [by obligations of the United States], even though the potential for "profit" was present, to say nothing of the qualifications and exemptions which might have had to have been engrafted on the statute. In this context, the anti-"profit" purpose of Congress in enacting section 103(c) becomes even more significant. In short, as finally enacted, section 103(c) was designed to deal only with the legislative concern that arbitrage profits should be eliminated. [Fn. ref. omitted.]

Thus, contrary to petitioner's contention, section 103(c) applies not only to the categories of direct investment set forth in T.I.R. 840 (see p. 774 supra), but to the use of bond proceeds

---

language virtually identical to that used by the House in H. Rept. 91–413, at 173 (1969), 1969–3 C.B. 308, quoted in note 14 *supra*. Unlike the House explanation, however, the Senate described arbitrage transactions as including not only the purchase of "Federal" obligations, but the purchase of "other obligations" as well. S. Rept. 91–552, at 219 (1969), 1969–3 C.B. 562 ("General reasons for change"). No explanation was given as to why, as stated in the last sentence quoted in the text above, arbitrage bonds were "also defined" by the Senate bill to include obligations the proceeds of which would be used to replace funds which were used to acquire materially higher yielding obligations.

"directly or indirectly" to acquire any type of taxable security or obligation or to replace funds used "directly or indirectly" to acquire such securities or obligations. The broad language of the section, read in the context of its legislative history, shows a purpose to prevent avoidance of the force of the statute through manipulation of the form of municipal borrowing in such a way as to create arbitrage profits. We think the disputed regulations must be tested in the light of the broad legislative objective that significant amounts of arbitrage profits be eliminated.

### 4. The Adoption of the Sinking Fund Regulations

Between 1970 and 1978, proposed regulations were issued, withdrawn, reissued, revised, and corrected several times without any indication that tax and other revenues deposited in a sinking fund would be subject to the section 103(c) arbitrage limitations. Petitioner contends that, therefore, the sinking fund regulations issued in 1979 represent a repudiation of the Treasury Department's original construction of section 103(c) as reflected by earlier proposed regulations. We disagree.[16]

As stated in *National Muffler Dealers Assn. v. United States,* 440 U.S. 472, 477 (1979), if a regulation does not constitute a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent, "the manner in which it evolved merits inquiry." It is necessary, therefore, to examine the evolution of the sinking fund regulations.

It is true, as petitioner emphasizes, that the earlier proposed regulations did not deal with sinking funds. The preamble to the proposed sinking fund regulations, first issued on May 8, 1978 (43 Fed. Reg. 19675 (1978)), states that such regulations were being adopted because—

Some issuers have avoided the restrictions on investment yield by contributing taxes or other revenues to a sinking fund. The sinking fund is then invested at a rate which allows the issuer, where the entire issue is retired at

---

[16]Even if the sinking fund regulations were inconsistent with the prior interpretation of the statute, they would not necessarily be invalid as petitioner seems to suggest. See *National Muffler Dealers Assn. v. United States,* 440 U.S. 472, 485 (1979); *Helvering v. Wilshire Oil Co.,* 308 U.S. 90, 101 (1939).

the end of a fixed period, to make a profit on the investment of the fund. * * *

Revisions of the proposed sinking fund regulations published in 43 Fed. Reg. 39822 (1978) explained in greater detail the rationale for adopting such rules:

### INVESTED SINKING FUNDS

Typically, municipal bonds have serial maturities. For example, if a city sells $10 million of 20-year school bonds, the city may use property taxes to pay a portion of the principal each year. Thus, for the protection of the bondholders, the bonds will be paid off gradually over 20 years and the $10 million principal amount will not come due all at once. However, if the city employs an invested sinking fund, it will not pay any principal until the bonds come due in 20 years. Instead, the city will periodically pay property taxes into a sinking fund. Amounts held in the sinking fund will be invested in high-yield Treasury notes or other high-grade investments, enabling the city to make a substantial investment profit.

The invested sinking fund was devised as a way around Treasury's arbitrage regulations. Certain State and local governments were able to gain a financial advantage from invested sinking funds. However, invested sinking funds (like other forms of arbitrage) have the long-term effect of being a burden on taxpayers and a threat to the market for municipal bonds. In particular, invested sinking funds damaged the tax-exempt market in two ways. First, bonds that used this device were left outstanding longer because they were not retired serially. Second, many refunding issues were motivated chiefly by the profit that could be earned from an invested sinking fund; these issues would not have been sold if that profit had not been available. The invested sinking fund device could have resulted in nearly a 50-percent increase in the amount of tax-exempt bonds outstanding without taking account of advance refundings.

Prior to the final adoption of the sinking fund regulations, Senator Bentsen introduced a bill, S. 3370, 95th Cong., 2d Sess. (1978), to declare the proposed regulations invalid. At the Senate Finance Committee hearings on the bill, representatives of the Treasury Department and of various State and local governments testified. In the course of those hearings, Assistant Secretary Lubick explained that the sinking fund regulations were adopted in response to a relatively new and widespread attempt to circumvent section 103(c) through the use of sinking funds,[17] in part, as follows (Hearings on H.R.

---

[17]Although the city's sinking fund for the first, third, and proposed fifth series of the project of 1973 bonds was established in the city's fiscal year 1973–74, we have found nothing to suggest that it came to the attention of the Treasury Department or that invested

13511 Before the Senate Comm. on Finance, 95th Cong., 2d Sess. (Part 4) 950 (1978)):

The computer programed invested sinking fund is a relatively new device. We had sinking funds around for a long time. But by and large, the computer programed investment fund that we are talking about these days is about a year or two old and is an ingenious way of circumventing the arbitrage rules which were enacted by the Congress in 1969.

Typically, municipal bonds were issued with a serial maturity. After a certain period, bonds of a given issue would mature and be retired; or, they may have a single terminal date, but a certain portion of them would be called each year after being outstanding for a period of time.

Now, the invested sinking fund changes that practice by leaving the entire amount of an issue outstanding until the ultimate maturity date, and, instead of calling bonds or having a portion of the bonds mature prior to that date, the revenues from the project are put into a sinking fund and invested, usually secured by U.S. bonds, and held until the ultimate maturity date, in which case bonds are then paid off.

The result is that during this extended period, during which the sinking fund is built up and invested, you have an arbitrage profit earned by the State and local government. Its bonds are outstanding, for example, at 6 or 5.5 percent and the sinking fund is building up and earning interest at 7.5 or 8 percent.

It is to the advantage of the State and local government to keep the bonds outstanding as long as possible, until the ultimate maturity, because it can make this arbitrage profit.

The bill to declare the proposed regulations invalid was not enacted.[18] the regulations were promulgated as final regula-

---

sinking funds became prevalent prior to the date suggested by Assistant Secretary Lubick. In this connection, see generally Peaslee, "The Limits of Section 103(c): Municipal Bond Arbitrage After the Invested Sinking Fund," 34 Tax L. Rev. 423, 427, 430 (1979), noting that:

"Perhaps because of the publicity surrounding the enactment of section 103(c) and the issuance of temporary and proposed regulations thereunder, members of the municipal financial community, since 1969, have become quite sensitive to arbitrage considerations in promoting and designing bond issues. Their efforts have culminated in the development of an impressive collection of financing techniques which attempt, with varying degrees of success, to avoid the effects of section 103(c). * * * "

\*     \*     \*     \*     \*     \*     \*

"Sinking funds were being used as an arbitrage device to extend the maturity of indebtedness and to hold revenues or taxes captive for a substantial period of time for purposes of investment. * * * "

[18]Respondent suggests that this congressional "acquiescence" through inaction, following extensive hearings in which the proposed regulations were ventilated, is evidence that Congress at that time did not find the sinking fund regulations contrary to its will. However, the Supreme Court has stated that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one" and that "nonaction by Congress affords the most dubious foundation for drawing positive inferences." *United States v. Price*, 361 U.S.

tions in T.D. 7627, effective for obligations issued after May 31, 1979. 44 Fed. Reg. 32657 (1979).

## 5. *Validity of Sinking Fund Regulations*

The foregoing history of the sinking fund regulations shows they were adopted in response to efforts by borrowing municipalities to circumvent section 103(c) by using invested sinking funds to realize profits on the difference between the interest paid on tax-exempt obligations and the interest received from taxable obligations. The municipalities could achieve this result by accumulating a sinking fund expected to be used for the repayment of bonds, holding the annually increasing fund until the entire (or most of the) bond issue became due at the end of a 20-year period, for example, and in the meantime investing the funds in Federal Government (or other) securities paying higher interest rates.[19] Such use of a sinking fund

---

304, 310–311, 313 (1960). Accordingly, we cite these hearings and Assistant Secretary Lubick's statement mainly for the explanation of the circumstances in which the sinking fund regulations evolved. *National Muffler Dealers Assn. v. United States, supra* at 485.

[19] The following table shows the accumulation in the city's sinking fund for the three relevant bond issues without regard to *any* investment income:

| Fiscal year | Cumulative deposits for principal | Cumulative bond maturities | Difference (sinking fund accumulation) |
| --- | --- | --- | --- |
| 1973–74 | $800,000 | $25,000 | $775,000 |
| 1974–75 | 1,745,000 | 50,000 | 1,695,000 |
| 1975–76 | 2,695,000 | 75,000 | 2,620,000 |
| 1976–77 | 3,395,000 | 100,000 | 3,295,000 |
| 1977–78 | 4,335,000 | 125,000 | 4,210,000 |
| 1978–79 | 5,275,000 | 150,000 | 5,125,000 |
| 1979–80 | 6,215,000 | 175,000 | 6,040,000 |
| 1980–81 | 7,180,000 | 200,000 | 6,980,000 |
| 1981–82 | 8,195,000 | 225,000 | 7,970,000 |
| 1982–83 | 9,210,000 | 250,000 | 8,960,000 |
| 1983–84 | 10,225,000 | 275,000 | 9,950,000 |
| 1984–85 | 11,240,000 | 300,000 | 10,940,000 |
| 1985–86 | 12,255,000 | 325,000 | 11,930,000 |
| 1986–87 | 13,270,000 | 350,000 | 12,920,000 |
| 1987–88 | 14,095,000 | 375,000 | 13,720,000 |
| 1988–89 | 14,920,000 | 400,000 | 14,520,000 |
| 1989–90 | 15,745,000 | 1,225,000 | 14,520,000 |
| 1990–91 | 16,570,000 | 2,050,000 | 14,520,000 |
| 1991–92 | 17,395,000 | 16,545,000 | 850,000 |
| 1992–93 | 17,470,000 | 17,045,000 | 425,000 |
| 1993–94 | 17,545,000 | 17,545,000 | 0 |

Although we do not think the allocation provisions of sec. 1.103–13(g)(6), Income Tax Regs., may be used to support the sinking fund regulations in the instant case, this table, coupled

produces the same undesirable consequences of arbitrage as section 103(c) was intended to cure—the issuance of an abnormally large volume of bonds in relation to municipal needs for improvements, increased public borrowing costs, the crowding of weaker borrowers out of the market, and a loss of Federal revenues. The sinking fund regulations designed to control this "relatively new" and "ingenious way of circumventing the arbitrage rules" (see statement of Assistant Secretary Lubick, p. 779 *supra*) are thus clearly consistent with the broad objectives and purposes of section 103(c).

In deciding whether the regulations are "unreasonable and plainly inconsistent" with the language of section 103(c), *Commissioner v. South Texas Lumber Co., supra* at 501, it is important to bear in mind the expansive terms of that section. It defines an arbitrage bond, which "shall be treated" as one not entitled to exemption, as an obligation which is issued where "all or a major portion" of its proceeds are "reasonably expected to be used directly or indirectly" to "replace funds which were used directly or indirectly" to acquire higher yielding obligations. Respondent argues that the moneys to be deposited in the city's sinking fund will be used directly to acquire materially higher yielding securities (which will be, in effect, pledged to the repayment of the proposed bonds) and that the proceeds of the proposed bonds are "reasonably expected" to be used "indirectly" to replace those moneys. He emphasizes that this argument must be viewed in the light of section 103(c)(6) in which Congress, apparently recognizing that it could not foresee all forms that arbitrage might take, directed the Secretary to prescribe regulations necessary to carry out the "purposes" of the section. See *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 169 (1981); *Douglas v. Commissioner*, 322 U.S. 275, 280, 281 (1944).

Petitioner's position, however, is that the language of section 103(c)(2)(B) will not support the regulations. The city emphasizes that section 103(c) deals with the expected use of bond "proceeds"; it argues that the literal and commonly understood meaning of that term (viz, amounts received upon

---

with the ones at notes 4 & 6 *supra*, demonstrates the potential for circumvention of the purpose of sec. 103(c) to eliminate arbitrage profits.

the sale of obligations) precludes characterization of the sinking fund moneys as "proceeds." Second, emphasizing the "were used" language of section 103(c)(2)(B), the city contends that the proceeds of the proposed bonds will not "replace" moneys which will be deposited in the sinking fund.

We disagree with the city's contention that the literal meaning of the term "proceeds" or the "were used" language is dispositive of the question before us. The sinking fund regulations do not state that sinking fund moneys are bond "proceeds"; rather, the regulations state that such moneys shall be "treated as proceeds" to the extent that the issuer reasonably expects to use the moneys to pay principal or interest on the issue. This is more than a linguistic difference.[20] Section 103(c)(2)(B) in defining arbitrage bonds refers to bond proceeds "reasonably expected" to be used "directly or indirectly" to replace "funds" which were used "directly or indirectly" to acquire higher yielding securities. We think the regulations reasonably implement this language in requiring that "funds" be "treated as proceeds" of bonds for purposes of section 103(c) if such "funds" are in fact "reasonably expected" to be "directly or indirectly" replaced by bond proceeds.

If a municipality accumulates funds (from sources other than bonds) to finance a public project, but then uses those funds to acquire high yielding taxable obligations and sells its own tax-exempt bonds expecting to use the proceeds for the public project, it seems clear that the accumulated funds have been indirectly replaced by bond proceeds and, for the purposes of section 103(c), should be "treated as proceeds" of the bonds. Economically, the municipality is in the same position it would have been had it used the accumulated funds for the public project and issued the bonds to acquire the higher yielding taxable securities.

We perceive no reason why a municipality which issues bonds to be used for a particular purpose, reasonably expecting to collect funds which otherwise would be used for that purpose but which will be invested pending the retirement of the bonds, should be treated differently from a municipality which collects and invests the funds before issuing bonds. It

---

[20] If the sinking fund moneys were themselves "proceeds," then the investment of such moneys in taxable obligations would be covered by the language of sec. 103(c)(2)(A).

seems unlikely that Congress would have given the broad direction to the Secretary in section 103(c)(6) to issue regulations "to carry out the purposes" of the subsection had it intended the language to be taken as literally and narrowly as petitioner reads it; none of the legislative history suggests that the time sequence of events producing arbitrage was to be decisive. As stated by respondent—

Under section 103(c), the determination of whether a bond is an arbitrage bond depends on the issuer's reasonable expectations at the time of issuance. In other words, section 103(c) is concerned with the issuer's expectations as to the future use of proceeds. In particular, section 103(c)(2)(B) is concerned that bond proceeds not be used (at some future time) to replace funds that were used to acquire obligations.

It is true that, as petitioner emphasizes, the proceeds of its proposed bonds may be used "directly" only to pay for public street improvements. It is also true that the amounts to be deposited into the sinking fund for the proposed bonds may be used "directly" only to pay debt service on those bonds. But section 103(c) is not limited to the direct use of bond proceeds. The section also covers indirect use. We think it may reasonably be said that the bond proceeds are expected to be used *"indirectly"* to replace moneys to be deposited into the sinking fund.[21] In terms of economics, due to the restrictions limiting the use of petitioner's sinking fund to payment of debt service on the bonds, the deposits into the fund will have much the same effect as a retirement of the bonds to the extent of the deposits. However, as long as the city chooses not to retire the bonds, it will be able to exploit the difference between taxable and tax-exempt bond interest rates,[22] i.e., to earn an arbitrage profit by investing the sinking fund in taxable securities or obligations.[23] In a very real sense, then, the direct use of the

---

[21]Indeed, in every borrowing it may be said generally that a replacement of funds occurs; namely, the substitution of borrowed funds for moneys reasonably anticipated to be earned or collected in the future to repay the debt.

[22]The city concedes that it plans to exploit this interest differential, stating on brief as follows:

"The actual term during which amounts in the sinking fund will remain invested will be a function of future financial circumstances. If interest rates and rates of inflation continue to rise, the sinking fund could remain invested until the bonds mature. Should there be a significant decline in rates of interest and inflation, an earlier application of the fund could be advisable. * * * "

[23]As respondent stated in his ruling letter:

"To put it somewhat differently, the sinking fund will result in what amounts to a constructive retirement of the Bonds. Very nearly the same results could be achieved by an

bond proceeds to pay for street improvements will indirectly replace the amounts deposited into the sinking fund pledged to the repayment of the debt (and which, thus, will indirectly be used to pay for the street improvements) by freeing those amounts for investment during the period the bonds are outstanding.[24]

## 6. *Conclusion*

In summary, the sinking fund regulations evolved in the light of Treasury's experience in administering section 103(c), as a response to efforts to circumvent that section. They serve the purpose of section 103(c) to eliminate arbitrage profits and do not conflict with the language of section 103(c). The regulations should, therefore, be sustained. We have no doubt that other reasonable interpretations of the statutory lan-guage in question can be advanced, but: "The choice among reasonable interpretations is for the Commissioner, not the courts." *National Muffler Dealers Assn. v. United States*, 440 U.S. 472, 488 (1979). We must therefore decline the city's request to declare that the proposed obligations are described in section 103(a)(1).

*An appropriate decision will be entered.*

---

alternative arrangement in which the city actually retired the Bonds and also issued new Bonds each year for the sinking fund. This alternative arrangement would clearly have the purpose and effect of producing arbitrage, and the invested sinking fund has essentially the same purpose and effect."

[24]The city represents that a sinking fund program provides benfits which exist apart from the investment of the fund at higher yields than are paid on borrowings. Thus, petitioner states on brief that—

"Even disregarding such yield differentials, the City's financing program provides flexibility in the management of its debt, reduced costs to the citizens and taxpayers of the City and enhanced ability to meet debt service requirements in years of reduced cash flows. Because of these benefits to the issuer, the program enhances the creditworthiness of the issuer's obligations."

Granted that these benefits are important to the city's financing programs, we fail to see how they relate to the issue in this case. The sinking fund regulations do not prohibit the use of sinking funds, but merely remove the element of arbitrage profits (i.e., the "yield differentials") which prompted the enactment of sec. 103(c). See sec. 1.103–13(g)(7), example (1), Income Tax Regs.

In this connection, it should be noted that the United States specially issues obligations which can be purchased by local governments without violating the arbitrage provisions. See 31 C.F.R. sec. 344. Further, sec. 103(c) permits investment in tax-exempt obligations of State and local governments without regard to any differences in yield.