THIRION MAILLARD, EARNEST CAYLERS, AND HAMILLE C. ROU-MAGE, PLAINTIFFS IN ERROR, *v.* CORNELIUS W. LAWRENCE.

By the Tariff Act of 1846, a duty of thirty per cent. *ad valorem* is imposed upon articles included within schedule C; amongst which are "clothing ready made and wearing apparel of every description; of whatever material composed, made up, or manufactured, wholly or in part by the tailor, sempstress, or manufacturer.

By schedule D a duty of twenty-five per cent. only is imposed on manufactures of silk, or of which silk shall be a component material, not otherwise provided for; manufactures of worsted, or of which worsted is a component material not otherwise provided for.

Shawls, whether worsted shawls, worsted and cotton shawls, silk and worsted shawls, barage shawls, merino shawls, silk shawls, worsted scarfs, silk scarfs, and mouseline de laine shawls, are wearing apparel, and therefore subject to a duty of thirty per cent. under schedule C.

The popular or received import of words furnishes the general rule for the interpretation of public laws as well as of private and social transactions.

THIS case was brought up by writ of error, from the Circuit Court of the United States for the Southern District of New York.

It was an action brought by the plaintiffs in error against Lawrence, the collecter of the port of New York, for a return of duties alleged to have been improperly exacted upon certain importations of shawls.

The circumstances of the case and the various prayers to the Circuit Court, both on behalf of the plaintiffs and defendant, are fully stated in the opinion of the court.

It was argued by *Mr. McCullok* and *Mr. Cutting*, for the plaintiffs in error, and *Mr. Cushing*, (Attorney-General) for the defendant.

The points made by the counsel for the plaintiffs in error, were the following:

1st. The first, second, third, and fourth instructions asked for by the defendant, and granted by the court, are erroneous, each of them —

(a.) Because the terms, "clothing ready-made and wearing apparel of every description, made up or manufactured by the tailor, sempstress, or manufacturer," used in schedule C, of tariff of 1846, do not include by their own force all articles which can be used as personal dress either for the adornment, protection, or comfort of the person; and

(b.) Because, where in said tariff of 1846 the use to which an article may be usually put is intended to govern the rate of duty to be exacted, the statute expressly so declares.

(c.) Because, by all the proofs, said terms, "wearing apparel," as used in trade and commerce in July, 1846, did not embrace such shawls and scarfs.

Maillard et al. *v.* Lawrence.

(d.) Because, the terms "wearing apparel," as used in said act of 1846, are either synonymous with "ready-made clothing," or too indefinite to assess any other article, than ready-made clothing with duty.

(e.) Because the tariff should be construed according to the commercial sense and meaning of the terms employed. The charge is in this respect opposed to the settled law of this court.

2d. The fifth and sixth instructions asked by the defendant, and granted by the court, were erroneous;

(a.) Because the fifth assumes that in commerce the addition of fringes by hand to some of said shawls and scarfs, after they come from the loom, necessarily brings them within the terms, "articles worn by women or children made up, or made wholly, or in part, by hand," which are employed in said schedule C.

(b.) Because the sixth assumes that the making of knots in the fringes, or the twisting of said fringes by hand in some of said shawls, after the shawls came from the loom, necessarily brings the shawls within the clause, "articles worn by women and children, made up or made wholly, or in part, by hand."

The court erred in refusing the plaintiffs' prayers, because—

3d. The shawls and scarfs in question being in trade and commerce known as "manufactures of silk" or "worsted," and not being known in commerce as "clothing ready-made," nor as "articles worn by women and children," the adding of fringes by hand, or the knotting and twisting these fringes by hand, does not take them out of the classes of "manufactures of silk, or of which silk shall be a component material, not otherwise provided," and of "manufactures of worsted, or of which worsted shall be a component material, not otherwise provided for," specified by schedule D.

4th. The proof shows that in trade and commerce the term "made," or "made up," used in schedule C, does not embrace goods to which fringes, borders, knots, or tassels, are added after the fabric is made in the loom; nor force goods with such additions to be rated or known as "articles worn by women, made up, or made wholly, or part by hand."

5th. The use to which goods may be put, in fact, does not exclude them from the commercial class to which they belong.

6th. The goods cannot be classed under schedule C, because the proof shows that in the language of trade and commerce they are not either. (a.) "Articles worn by men, women, or children, made up, or made wholly or in part by hand." (b.) Nor "clothing ready-made, and wearing apparel made up, or manufactured wholly or in part by the tailor, sempstress, or manufacturer. (c.) Nor "manufactures of cotton, linen, silk, wool, or worsted, embroidered, or tamboured, in the loom or otherwise by machinery, or with the needle or other process."

7th. The opinions of the officers of the customs detailed in the proof, and the arguments attempted to be drawn by them from the exemption from duty, under schedule 1, " of wearing apparel in actual use, and other personal effects of persons arriving in the United States," do not establish any fact, nor furnish any guide in construing the tariff of 1846, so as to charge the shawls and scarfs in question with thirty per cent. duty, under schedule C.

8th. To charge the goods in question with thirty per cent. duty, by schedule C, instead of twenty-five per cent. by schedule D, it is essential that they should have been distinctly well known in commerce by the term " clothing ready-made, and wearing apparel," and as the term " clothing ready-made, and wearing apparel," by the testimony does not embrace such shawls and scarfs, the greater rate of thirty per cent. is not to be imposed.

9th. The terms employed in schedule C of the tariff of 1846, by which the exaction of thirty per cent. is claimed, are similar in substance with the terms of the act of 1842, and the practical construction and action of the government, in regard to shawls and scarfs, under that act, should be followed under the tariff of 1846.

10th. The exaction of thirty per cent., under schedule C, is not justified by any treasury instructions which are contrary to the commercial understanding, and to the rules of construction of the statute in regard to duties.

11th. The first, second, third and fourth prayers of the plaintiffs were, and each of them was in accordance with the settled law of this court, and the refusal of the court to instruct the jury upon any of the said propositions as prayed for, was erroneous.

The following is a part of the argument of the *Attorney-General.*

The question raised by the plaintiff in his action is simply this, are " shawls " wearing apparel?

The act of 1846 has not charged duties upon " shawls" by that name. But if it be found that " shawls " are wearing apparel, then the collector has charged the true legal rate of duty, without any excess; and the plaintiff's suit is without foundation in law.

For the signification of the word " shawls," as used in the plaintiff's invoices and entries at the custom-house, and of the words, " wearing apparel," as used in the statute of 1846, we must resort to the established use of that and of correspondent phrases in our own and in cognate languages, and to critical examination of their legal intent and import.

In McCulloch's Dictionary of Commerce we have this definition : " Shawls, (German — Schalen ; French — Chales ; Italian —Schavali ; Spanish — Chevalos) ; articles of fine wool, silk, or wool and silk, manufactured after the fashion of a large handkerchief, used in female dress. The finest shawls are imported from India, &c. . . . Shawls are made of various forms, sizes, and borders, which are wrought separately with the view of adapting them to the different markets."

In the Dictionary of French and English by Professors Flemming and Tibbits, we have this definition and explanation : " Shawl," (English) " Grand mouchoir de cou," (French) — signifying a great handkerchief for the neck.

In the Dictionary of Commerce, published in Paris, in 1839, under the direction of Guillaman, we have this definition : " Chäle," grande piéce d'étoffe, dont les femmes se couvrent les epaules, et qui est ordinairement fabriqué dans le gout des Châles de l'Orient." (Shawl — a large piece of cloth with which the women cover their shoulders, usually manufactured in the fashion of the shawls from the east.)

In Landais' French Dictionary, (which has gone through eleven editions,) we have this definition : " Schall," — longue piece d'étoffe de soie, ou de laine, dont les habitants de l'Egypte s'entourent la tête. Le schall est adopté depuis longtemps par les dames Francaises, qui le portent sur les epaules — ou écrit aussi châle." (Shawl — a long piece of cloth of silk or wool with which the inhabitants of Egypt surround the head. The shawl has been long since adopted by the women of France, who wear it on their shoulders — it is also written " châle."

In the Dictionary of the French Academy, this definition is given : " Châle — longue piéce d'étoffe dont les orientaux s'enveloppent la tête, et qui entre aussi de diverses manières dans leur vétement." (Shawl — a long piece of cloth with which the orientals environ the head, and which, in divers ways, makes à part of their apparel.)

Consulting English lexicons, we find these definitions : " Shawl, a part of modern female dress." — *Worcester.*

" Shawl, a cloth of wool, cotton, silk, or hair, used by females as a loose covering for the neck and shoulders." — *Webster.*

Craig's Dictionary of the English Language (which is considered the best present standard work) gives us this definition : " Shawl, a kind of large kerchief, originally from India, which forms a part of modern female dress, being worn as a loose covering for the shoulders and back."

These various lexicographers all agree that shawls are wearing apparel.

The plaintiffs, to evade the definitions in commercial diction-

aries and other lexicons, and the descriptive words in the statute, (schedule C,) and the mass of testimony given in this cause, and the invoices and entries at the custom-house by themselves, offer the oaths of men, "that in trade and commerce, articles of this description are not considered wearing apparel;" that shawls of this description "are not known among merchants as wearing apparel;" that, "in a commercial sense, none of these shawls are made up, nor are they known among merchants as wearing apparel; that these shawls 'commercially speaking,' are not wearing apparel."

Declarations of this nature by witnesses avail nothing. Shawls are known in commerce as wearing apparel, these witnesses to the contrary, notwithstanding. These witnesses say, in one breath, shawls are not, "in a commercial sense, wearing apparel;" are not, "commercially speaking, made up, nor known among merchants as wearing apparel;" and in the next breath tell us they are worn by women, and come from the manufacturer "in a complete state to be worn," with their fringes tied by hand, with separately woven borders united to them, ready for use; yet they say, "commercially speaking," and "in a commercial sense," they are neither "made up," nor "wearing apparel!"

Such contrariant absurdities the plaintiffs propose to dispose of by the oaths of the two tailors, Raymond and Beaumont, who swear that they have "purchased shawls of this description to make up into gentlemen's garments; into waistcoats and dressing-gowns;" and who think "that shawls are not wearing apparel till they are made up in this way."

According to their mode of thinking, the cashmere, and other fine shawls imported from India, were not known among merchants as wearing apparel, and were not wearing apparel unless they were made up into gentlemen's garments, waistcoats, and dressing-gowns, or such like; that is, "commercially speaking," and "in a commercial sense!"

Such evidence, in favor of the plaintiffs, made "commercially," and "in a commercial sense," cannot outweigh commercial dictionaries and other lexicons; cannot do away long established usages, and make us disbelieve what our eyes see day after day; that is, shawls in actual use, as parts of the wearing apparel of females.

The statute, in schedule C, uses plain language to describe two great general classes of merchandise: the first, "clothing ready-made," the second, "wearing apparel of every description, of whatever material composed, made up or manufactured wholly or in part by the tailor, sempstress, or manufacturer." The witnesses for the plaintiffs confound the two classes, omit

parts of the descriptions of the second class, endeavor to confuse the plain meaning of the statute by introducing a sophistical sense, called by them "a commercial sense;" and even in that they put away the established significations of words, contradict standard writers on commerce, and repudiate common sense and common usage.

Wearing apparel is a general description or genus comprehending many species, and shawls are undoubtedly a species of wearing apparel. Common use, the definitions and explanations of learned writers of commercial dictionaries, and of other lexicons, the daily experience of our own eyesight, all concur to convince our understandings, beyond a doubt, that shawls are a species of apparel worn by females. If shawls are not "made up or manufactured wholly or in part by the tailor, sempstress, or manufacturer," how or by whom are they made? Certain it is they are not a raw material, but are the products of art and labor.

Congress, in legislating the system of duties on imports in the act of 1846, (schedule C,) has given a description for revenue purposes, which clearly comprises these shawls; the words of description employed in the statute must have their known signification as established by standard writers, use, and general acceptation. The sophistications attempted by the witnesses for plaintiffs about a "commercial understanding," and "in a commercial sense," are foreign to the case, and are overruled by this court in De Forest *v.* Lawrence, 13 Howard, 282.

Mr. Justice DANIEL delivered the opinion of the court.

The plaintiffs in error instituted in the court aforesaid against the defendant an action of trespass on the case for the recovery of an alleged excess of duties charged by the defendant as collector of the port of New York, and paid to him under protest by the plaintiffs upon certain goods imported by them from Havre in France, and described by them in the invoices and entries thereof as "worsted shawls, worsted and cotton shawls, silk and worsted shawls, barege shawls, merino shawls, silk shawls, worsted scarfs, silk scarfs, and mousseline de laine shawls." There appear to have been nineteen different importations by the plaintiffs, comprised within the description just given, but a particular or separate enumeration of them is not necessary, it being admitted that the protest of the plaintiffs embraced the whole of them, and that the correctness or incorrectness of the proceeding in reference to each of them depends upon the construction of the same statute. Upon the articles thus described, the collector charged the duty of thirty per centum *ad valorem* as being wearing apparel within the meaning

of schedule C, in the act of Congress of the 30th of July, 1846. Vid. 9th Stat. at L. c. 74, p. 44.    The plaintiffs insist that according to schedule D, in the same statute, they were bound to pay at the rate of twenty-five per centum *ad valorem* only, and for a recovery of the difference between this last rate and that at which they have made payment, their action has been brought.

Upon issue joined on the plea of non-assumpsit and under instructions from the court as to the import of the provisions of the statute of July 30th, 1846, a verdict was found for the defendant, and a judgment entered in accordance therewith. This case is comprehended within narrow limits, and its decision must depend entirely upon the interpretation of those portions of the statute of 1846, designated as schedules C and D, as to the description and enumeration of the articles subjected to duties and the rate of impost prescribed by these schedules.

In schedule C, which imposes a duty of thirty per centum *ad valorem*, are comprised the following articles, in the literal terms of the law, "clothing ready-made, and wearing apparel of every description, of whatever material composed, made up, or manufactured, wholly or in part by the tailor, sempstress, or manufacturer."

By schedule D, of the same act, it is declared that an impost of twenty-five per centum only shall be levied on "manufactures of silk, or of which silk shall be a component material, not otherwise provided for; manufactures of worsted, or of which worsted is a component material, not otherwise provided for."

Several witnesses were examined by the plaintiffs, with the view of showing that in a mercantile sense the term shawls, under which descriptive name the goods of the plaintiffs were entered, did not include "wearing apparel," and *a fortiori* not wearing apparel either made up or manufactured wholly or in part by the tailor, sempstress, or manufacturer, and that therefore under the provision of schedule D they were subject to an impost of twenty-five per centum only as manufactures of silk or worsted, "not otherwise provided for." Countervailing evidence was adduced on the part of the defendant to show that, in a mercantile sense, and by generally received and notorious acceptation, and by the plain and even imperative language of the statute, shawls were established to be wearing apparel; and consequently came within the rates imposed by schedule C, and could not be brought within the description in schedule D, as articles "not otherwise provided for." The character of the evidence, or more properly the points it was designed to bear upon, most plainly appear from the several prayers submitted at the trial, and by the rulings of the court upon those prayers.

22 *

The counsel for the plaintiffs moved the court to charge and instruct the jury, 1st. That if the jury shall find from the evidence that the shawls in question were known at the date of the passage of the said act of 30th July, 1846, in trade and commerce as "manufactures of worsted," or of which worsted was a component material, that then they are embraced in schedule D, and are only liable to a duty of twenty-five per centum *ad valorem*, and no more.

Second. That if the jury s .all find from the evidence that the shawls in question were not, at the date of the said last-mentioned act, in a commercial sense, and according to the meaning of the term among merchants, either —

1st. Articles worn by men, women, or children "made up," or made wholly or in part by hand. 2d. Nor clothing ready-made, or wearing apparel "made up," or manufactured wholly or in part by the tailor, sempstress, or manufacturer. 3d. Nor manufactures of cotton, linen, silk, wool, or worsted, embroidered or tamboured in the loom, or otherwise by machinery, or with the needle, or other process; then in either of said cases the articles in question are liable only to a duty of twenty-five per centum *ad valorem*.

Third. That if the jury shall find from the evidence that the articles in question were charged, under the act of 1842, with duty as "manufactures of combed wool or worsted," "manufactures of worsted, and manufactures of worsted and silk combined," under section 1, subdivision 1 of said act, and as "manufactures of cotton, or of which cotton shall be a component part under section 2, subdivision 2 of said act, then the articles in question are, under the act of 1846, liable to a duty of twenty-five per cent. *ad valorem*, and no more.

Fourth. That if the jury shall find from the evidence that, at the date of the passage of the said act of the 30th of July, 1846, the shawls in question were commercially known as "manufactures of worsted," or of which worsted was a component material, and that they were not known in trade and commerce as clothing ready-made, or as "wearing apparel" made up, or manufactured wholly or in part by the tailor, sempstress, or manufacturer, nor as articles worn by men, women, and children, made up, or made wholly or in part by hand, then they are chargeable with a duty of twenty-five per cent. *ad valorem*, and no more.

Whereupon his honor, the presiding judge, refused so to instruct the jury in accordance with all or any of the said several prayers, whereby the plaintiffs, by their counsel, had prayed the court to instruct the jury.

And thereupon the counsel for the plaintiffs then and there

excepted to the refusal of the said judge to instruct the jury in conformity with the said several prayers of the said plaintiffs, and also to the charge and instructing the jury by the said judge, in conformity with all, any, and every of the several prayers wherein the defendant's counsel had so prayed the court to instruct the jury as matter of law.

The counsel for the defendant insisted, as matter of law, and prayed the court to charge and instruct the jury as follows:

First. That shawls and scarfs suitable and adapted in the state they are imported, to be worn by women on the person, as an article of dress, and usually so worn by women in the United States, are "wearing apparel," "made up" or manufactured wholly or in part, by the tailor, seamstress, or manufacturer, within the true meaning of schedule C, of the Tariff Act of the 30th of July, 1846, and are properly chargeable with the duty of thirty per centum *ad valorem*, prescribed by said schedule C.

Second. That shawls and scarfs of the description above named are not the less wearing apparel, made up or manufactured wholly or in part by the tailor, seamstress, or manufacturer, within the true meaning of the said schedule, though sometimes purchased by clothiers and tailors to be made up into vests, dressing-gowns, and other garments, as testified to by the witnesses for the plaintiffs in this case.

Third. That shawls and scarfs of the description above named are wearing apparel, made up or manufactured wholly or in part by the tailor, seamstress, or manufacturer, within the true meaning of the said schedule C, notwithstanding, at the date of the passage of the said act of July, 1846, they may not have been called or known by commercial men in trade and commerce by the name of wearing apparel.

Fourth. That whatever may have been, at the date of the said act, the definition given by commercial men to the term "wearing apparel," shawls and scarfs of the description above named are nevertheless wearing apparel, made up in whole or in part by the tailor, seamstress, or manufacturer, within the true meaning of the said schedule C.

Fifth. That shawls or scarfs suitable and adapted in their state as imported, to be worn by women and children, of whatever material composed, having fringes added by hand to the body of the shawls after the same has come from the loom, with sticks or needles, or other such implements, although according to commercial usage and understanding that said articles are not thereby charged in their commercial sense or acceptation, are articles worn by women and children made up or made wholly or in part by hand within the true meaning of the said schedule C, and are therefore chargeable with the duty of thirty per centum *ad valorem*, prescribed by said schedule C.

Sixth. That shawls and scarfs of the description above named, in the fringes of which, after the body of the shawls has come from the loom, knots are made by hand as a part of such fringes, or the fringes of which are twisted or otherwise completed by hand, although according to commercial usage and understanding the said articles are not, hereby changed in their commercial sense or acceptation, are, nevertheless, articles worn by women and children, made up or made wholly or in part by hand, within the true meaning of the said schedule C, and are therefore chargeable with the duty of thirty per centum *ad valorem*, prescribed by the said schedule C.

And thereupon his honor, the presiding judge, charged the jury in accordance with the several prayers in conformity with which the defendant's counsel had insisted as matter of law.

And thereupon the counsel for the plaintiffs excepted to said ruling of the court upon each of the said prayers.

In construing the provision of schedule C, we think that its meaning cannot be easily misconceived, if the rule of interpretation be drawn from the ordinary and received acceptation of its language, or from any regard to the sensible and consistent application of its words. It is obvious, that by the phrase " clothing ready-made, and wearing apparel of every description," the legislature did not mean to limit the enumeration to such habiliments as were either by necessity or by a regard to comfort or utility required to be changed from their original shape or fashion, and reshaped and reconstructed in order to adapt them to the human body, or to the purposes of life. Such a construction would render the member of the sentence immediately following and connected with the former by the copulative conjunction, and designing to introduce a new class of subjects, altogether absurd, and wholly inoperative. It must be understood as being the intention of the legislature to add to " clothing ready-made," in the acceptation above given, every article which in its design and completion and received uses, is an article of wearing apparel, and to comprise such article within schedule C of the act of 1846, no matter of what material composed, either in whole or in part, or by whom composed or made up, whether by the tailor, sempstress, or manufacturer. The question to be determined has no relation either to material, or process, or agent, but exclusively to the origin and purposes of the subject of the duty imposed as being in its design and in its finished condition " wearing apparel." Simply, in other words, whether shawls are wearing apparel.

By the several prayers pressed upon the Circuit Court for instructions to the jury, the object to which they are all directed has been the diversion of the jury from this the only legitimate

inquiry before them. The effort has been to substitute for the literal and lexicographical and popular meaning of the phrase "wearing apparel," some supposed mercantile or commercial signification of these words, and to render subservient to that signification what was clearly accordant with the etymology of the language of the statute, with the essential purposes and action of the government, and with the wide-spread, if not the universal understanding, of all who may not happen to fall within the range of a limited and interested class. In instances in which words or phrases are novel or obscure, as in terms of art, where they are peculiar or exclusive in their signification, it may be proper to explain or elucidate them by reference to the art or science to which they are appropriate; but if language which is familiar to all classes and grades and occupations — language, the meaning of which is impressed upon all by the daily habits and necessities of all, may be wrested from its established and popular import in reference to the common concerns of life, there can be little stability or safety in the regulations of society. Perhaps within the compass of the English language, and certainly within the popular comprehension of the inhabitants of this country, there can scarcely be found terms the import of which is better understood than is that of the words "shawl" and "wearing apparel," or of "shawl" as a familiar, every day and indispensable part of wearing apparel. And it would seem to be a most extravagant supposition which could hold that, in the enactment of a law affecting the interests of the nation at large, the legislature should select for that purpose language by which the nation or the mass of the people must necessarily be misled. The popular or received import of words furnishes the general rule for the interpretation of public laws as well as of private and social transactions; and wherever the legislature adopts such language in order to define and promulge their action or their will, the just conclusion from such a course must be, that they not only themselves comprehended the meaning of the language they have selected, but have chosen it with reference to the known apprehension of those to whom the legislative language is addressed, and for whom it is designed to constitute a rule of conduct, namely, the community at large. If therefore the strange concession were admissible that, in the opinion of a portion of the mercantile men, shawls were not considered wearing apparel, it would still remain to be proved that this opinion was sustained by the judgment of the community generally, or that the legislature designed a departure from the natural and popular acceptation of language.

Another position pressed upon the Circuit Court in behalf of the plaintiffs in error, as is shown by the evidence and by one

of the prayers to the court, was this: that shawls, in the form in which they are fashioned and finished by the manufacturer, could not properly be termed wearing apparel, because they are by tailors and clothiers frequently purchased to be worked up into vests and other garments. This position might, with equal propriety, be urged with reference to any article of wearing apparel whatsoever which should be diverted from its primal and regular use and design. The consistency and force of this argument, if such it deserves to be called, may be aptly illustrated by the account of the varied uses of a familiar article of wearing apparel found in a poetical description of the privations and expedients of a needy author, in which we read that,

> "A stocking decked his brow instead of *bay*,
> A *cap* by night, *a stocking* all the day."

According to the logic of the position last referred to, a stocking transferred into a night-cap is shown never to have been a stocking; and therefore never wearing apparel, notwithstanding its primitive denomination, the design for which it was knit or woven; or the offices to which it may have been usually applied.

To the rulings of the Circuit Court upon the prayers presented on behalf of the plaintiffs and defendants respectively, we deem it unnecessary to apply a separate comment. It is sufficient here to remark, that upon a deliberate examination of those rulings, in reference to the facts and features of the case, we accord to the former our entire sanction, as being coincident with the principles laid down in this opinion, and with a just interpretation of those clauses of the statute under color of which this action was instituted. We therefore adjudge that the decision of the Circuit Court be, and the same is hereby affirmed.

## *Order.*

This cause came on to be heard on the transcript of the record, from the Circuit Court of the United States for the Southern District of New York, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby affirmed, with costs.