**CITY OF TUCSON, ARIZONA, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 82–2187.

United States Court of Appeals, District of Columbia Circuit.

Argued March 28, 1983.

Decided June 12, 1987.

As Amended on Denial of Rehearing Sept. 24, 1987.

Michigan, pro hac vice, by special leave of Court, with whom Glenn L. Archer, Jr., Asst. Atty. Gen., and Michael L. Paup and Richard Farber, Attys., Dept. of Justice, Washington, D.C., were on brief, for appellee. L. Michael Wachtel, Counsel, Internal Revenue Service, Washington, D.C., also entered an appearance for appellee.

David H. Nelson, was on brief, for City of Phoenix, Arizona, amicus curiae, urging reversal.

Sidney G. Leech and Herman B. Rosenthal, Baltimore, Md., were on brief, for Nat. Ass'n of Bond Lawyers, amicus curiae, urging reversal.

Before ROBINSON, Circuit Judge, and WRIGHT and MacKINNON, Senior Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBINSON.

Dissenting opinion filed by Senior Circuit Judge WRIGHT.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The City of Tucson, Arizona, challenges a regulation of the Department of the Treasury on the ground of incompatibility with the statutory proscription it purports to implement. The regulation[1] provides that sinking funds established by state and local governments for payment of principal or interest on their bonds are subject to the yield restriction imposed by Section 103(c) of the Internal Revenue Code.[2] Each security in an issue covered by that section is classified as an "arbitrage bond," the interest on which does not enjoy any tax-exempt status as a municipal obligation. The United States Tax Court upheld the regulation.[3]

We find that neither the statutory text nor the legislative scheme sustains the Department's interpretation of Section 103(c).

Charles E. James, Jr., Phoenix, Ariz., for appellant.

Jay Miller, Atty., Dept. of Justice, of the Bar of the Supreme Court of the State of

---

1. Treas.Reg. § 1.103–13(g) (1979).

2. Tax Reform Act of 1969, Pub.L. No. 91–172, § 601(a), 83 Stat. 656 (1969) (codified as amended at 26 U.S.C. § 103(c) (1982 & Supp. III 1985)). For convenience, we refer to such obligations, whether issued by a state or by a political unit thereof, as municipal bonds. See note

12 *infra* for a discussion of the effect of the Tax Reform Act of 1986 on municipal bonds issued after August 15, 1986.

3. *City of Tucson v. Commissioner,* 78 T.C. 767 (1982).

We therefore reverse the Tax Court's decision and set aside the questioned regulation.

## I

Section 103(a)(1) of the Internal Revenue Code confers a general exclusion of interest on municipal bonds from gross income for purposes of federal taxation.[4] This concession has created a separate financial market in which state and local governments can borrow at interest rates significantly below those featured by taxable obligations.[5] While the interest differential undoubtedly is integral to a congressional effort to enhance governmental capacity to finance public works,[6] it has also afforded to issuers of municipal bonds an opportunity to pursue purely monetary goals at the expense of the animating legislative policy. The exclusion has enabled state and local governments to market their bonds at low rates of interest and use the proceeds to purchase taxable securities providing comparatively higher yields. Instead of providing funds for public improvements, municipal bond issues thus could be used simply to garner profits from the disparity in interest rates. Serving in this fashion as entrepreneurial vehicles for governmental issuers, municipal securities functioned as arbitrage bonds, in derogation of the legislative intent.[7]

Responsively to the prevalence of this practice, Congress enacted, as part of the Tax Reform Act of 1969, a provision denying tax exclusion of interest on municipal bond issues the proceeds of which expectably would produce arbitrage profits.[8] Codified as Section 103(c)(2) of the Internal Revenue Code, that provision expressly defines a non-exempt "arbitrage bond" as

any obligation which is issued as part of an issue all or a major portion of the proceeds of which are reasonably expected to be used directly or indirectly—

(A) to acquire securities ... or obligations ... which may be reasonably expected at the time of issuance of such issue, to produce a yield over the term of the issue which is materially higher ... than the yield on obligations of such issue, or

(B) to replace funds which were used directly or indirectly to acquire securities or obligations described in subparagraph (A).[9]

While not designed to cover all transactions in which municipal issues could serve to some extent as investment conduits,[10] Section 103(c)(2) does curtail the most pervasive and serious abuses by effecting a "mechanical test"[11] for identification of municipal securities actually functioning as arbitrage bonds.[12]

---

**4.** Revenue Act of 1916, § 4, 39 Stat. 756, 758 (1916) (codified as amended at 26 U.S.C. § 103(a)(1) (1982)).

**5.** See Peaslee, *The Limits of Section 103(c): Municipal Bond Arbitrage After the Invested Sinking Fund*, 34 Tax L.Rev. 421, 423 (1979).

**6.** For statements of the congressional objective underlying the present exclusion and its statutory forerunner, see, e.g., *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87, 55 S.Ct. 50, 51, 79 L.Ed. 211, 214 (1934); *Washington v. Commissioner*, 223 U.S.App.D.C. 404, 406 n. 5, 692 F.2d 128, 130 n. 5 (1982) (citing J. Chommie, Federal Income Taxation § 36 (1973)); *American Viscose Corp. v. Commissioner*, 56 F.2d 1033, 1034 (3d Cir.), *cert. denied*, 287 U.S. 615, 53 S.Ct. 17, 77 L.Ed. 534 (1932); *Drew v. United States*, 551 F.2d 85, 87 (5th Cir.1977); *Fox v. United States*, 397 F.2d 119, 122 (8th Cir.1968).

**7.** See Note, *The Tax Exempt Status of Local Government Bonds Used in Arbitrage Transactions*, 35 Geo.Wash.L.Rev. 574 (1967).

**8.** 26 U.S.C. § 103(c) (1982 & Supp. III 1985). Pertinent legislative history of this provision is examined in *Washington v. Commissioner, su-*

*pra* note 6, 223 U.S.App.D.C. at 409–413, 692 F.2d at 133–137.

**9.** 26 U.S.C. § 103(c)(2)(A)–(B) (1982).

**10.** See *id.*, § 103(c)(4)(A)–(B); *Washington v. Commissioner, supra* note 6, 223 U.S.App.D.C. at 412, 413, 692 F.2d at 136, 137.

**11.** *Washington v. Commissioner, supra* note 6, 223 U.S.App.D.C. at 409, 412, 692 F.2d at 133, 136.

**12.** Bonds issued after August 15, 1986, are subject to the provisions of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085 (codified in scattered sections of Titles 16, 19, 25, 26, 28, 29, 42, 46 and 49 U.S.C.A. (West Supp.1987)), which was enacted while this appeal was pending. This legislation, in 26 U.S.C.A. § 103(b)(2) (West Supp.1987), denies tax-exempt status to "[a]ny arbitrage bond within the meaning of section 148." Section 148 then provides:

(a) *Arbitrage bond defined.*—For purposes of section 103, the term "arbitrage bond" means any bond issued as part of an issue any portion of the proceeds of which are reasonably expected (at the time of issuance of the bond) to be used directly or indirectly—

The focal point of the case at bar is a regulation by the Department of the Treasury[13] purportedly pursuant to its authority to "prescribe such regulations as may be necessary to carry out the purposes of [Section 103(c)]."[14] That regulation undertakes to implement the statutory provision classifying as arbitrage bonds state or local issues producing proceeds "all or a major portion of" which "are reasonably expected to be used directly or indirectly ... to replace funds which were used directly or indirectly to acquire" instruments offering a materially higher yield.[15] The regulation specifies that amounts held in sinking funds to be used to pay principal or

> (1) to acquire higher yielding investments, or
>
> (2) to replace funds which were used directly or indirectly to acquire higher yielding investments.
>
> For purposes of this subsection, a bond shall be treated as an arbitrage bond if the issuer intentionally uses any portion of the proceeds of the issue of which such bond is a part in a manner described in paragraph (1) or (2).

Thus, old § 103(c)(2) continues to govern municipal bonds issued not later than August 15, 1986, while new § 148(a) applies to those issued thereafter. The language of new § 148(a) closely mirrors that of old § 103(c)(2), however, and the provision critical to this case, old § 103(c)(2)(B), is functionally identical to new § 148(a)(2). See text *supra* at note 9; H.R.Conf. Rep. 99–84, 99th Cong., 2d Sess. II–86 (1986).

The Tax Reform Act of 1986, like its predecessor, contains no provisions relating specifically to sinking funds, or any application of the arbitrage section thereto. The House Conference Report accompanying the 1986 legislation, H.R.Conf.Rep. No. 99–841, 99th Cong., 2d Sess., tit. XIII, at II–744 (1986), mentioned that current Treasury Department regulations "define bond proceeds to include original proceeds, investment proceeds, amounts accumulated in a sinking fund, other amounts replaced by bond proceeds, and transformed proceeds of a refunding issue," *id.* but did not either approve or disapprove any aspect of the sinking fund regulation, or address the specific issue here, *i.e.,* whether deposits in a sinking fund of revenues collected from ad valorem taxes "replace" the proceeds of an earlier bond issue that were devoted to public improvements. We cannot say that the passing reference in the report to sinking funds amounts to congressional ratification· of Treas.Reg. § 1.103–13(g) (1979). See *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 787–788, 101 S.Ct. 2142, 2150–2151, 68 L.Ed.2d 612, 623–624 (1981); *AFL–CIO v. Donovan*, 244 U.S.App.D.C. 255, 275, 757 F.2d 330, 350 (1985); *Citizen State Bank v. FDIC,* 751 F.2d 209, 217 (8th

interest on municipal bonds are to be deemed "proceeds of the issue."[16] Accordingly, investment of such funds in higher-yielding securities pending the occasion to discharge principal and interest on the bonds issued would transform them into nonexempt arbitrage bonds.

The validity of this regulation is the sole question on appeal. The City of Tucson issued four series of general obligation bonds, and proposed to issue a fifth, to finance various public works in obedience to the mandate of a special bond referendum.[17] The proceeds of each issue have been and would be expended solely for public improvements,[18] and principal and

Cir.1984); *West v. Bergland*, 611 F.2d 710 (8th Cir.1979).

Moreover, while the City has not yet issued the bonds precipitating this litigation, the functional identity of old § 103(c)(2)(B) and new § 148(a)(2) compels the conclusion that the controversy between the parties remains alive, and, together with the absence of congressional validation of Treas. Reg. § 1.103–13(g), lead us to conclude that the result we reach today would also follow were the issue to be considered exclusively under the new tax law. We emphasize the narrow scope of our holding. Other provisions of the Tax Reform Act of 1986 may well affect the taxability of the bonds the City proposes to issue, see, e.g., 26 U.S.C.A. § 148(f) (West Supp.1987) (required rebate to United States), but they have no bearing on our ruling that Treas. Reg. § 1.103–13(g) cannot be sustained either by old § 103(c) or by new § 148(a).

13. Treas.Reg. § 1.103–13(g) (1979).

14. 26 U.S.C. § 103(c)(6) (1982).

15. The statutory section relied upon, 26 U.S.C. § 103(c)(2)(B) (1982), is quoted more fully in text *supra* at note 9. The Department expressly identified this provision as the statutory basis for the challenged regulation. Rev.Rul. 78–349, 1978–2 C.B. 97, 98.

16. The relevant subsections of the regulation provide:

> (g) *Invested sinking funds—*(1) *In general.* Amounts held in a sinking fund for an issue (and receipts from investment of the sinking fund) are treated as proceeds of the issue.
> (2) *Sinking fund.* The term "sinking fund" includes a debt service fund, redemption fund, reserve fund, replacement fund, or any similar fund, to the extent that the issuer reasonably expects to use the fund to pay principal or interest on the issue.

Treas.Reg. § 1.103–13(g)(1)–(2) (1979).

17. *City of Tucson v. Commissioner, supra* note 3, 78 T.C. at 768–769.

18. *Id.* at 770. The bond proceeds have been used to provide sewers, street improvements

interest on the first, third, and fifth series would be paid from a common sinking fund.[19] As required by state law, the City levies annually an ad valorem property tax, from which payments are made annually into the sinking fund.[20] The City candidly acknowledges, however, an intent to invest the tax revenues placed in the sinking fund in higher-yielding securities until needed for debt service on its own issues,[21] and therein lies the problem. The regulation implicated here, while in terms inapplicable to the already-issued first and third series, would subject to Section 103(c)'s yield restriction all proceeds from future issues utilizing the sinking fund.[22] For this reason, the City petitioned the Tax Court for a judgment declaring the regulation invalid as an impermissible extension of the arbitrage-bond provision of Section 103(c),[23] and from the Tax Court's decision upholding the sinking fund regulation the City took this appeal.[24]

## II

■ The standard governing our review of the regulation under attack is well established. A treasury regulation commands significant judicial deference as a construction of a statute by the authority entrusted with its administration,[25] especially when, as here, the statute so construed itself contains an express grant of rulemaking power.[26] The regulation must

---

and lighting, police and fire facilities, libraries, and municipal recreational facilities.

**19.** *Id.* at 769 & n. 3.

**20.** *Id.* at 768. The fund would not, however, be the exclusive source of monies for payment of debt service on the issue; any legally available revenues could be so used. *Id.*

**21.** *Id.;* Letter from City of Tucson to Commissioner of Internal Revenue (June 29, 1979), Record Document (R.Doc.) 9, exhibit 2–B, at 1–2.

**22.** *City of Tucson v. Commissioner, supra* note 3, 78 T.C. at 773 n. 10.

**23.** Petition for Declaratory Judgment, *City of Tucson v. Commissioner,* No. 3889–80B (T.C.) (filed Mar. 19, 1980), R. Doc. 2. The petition was filed pursuant to 26 U.S.C. § 7478 (1982).

**24.** Notice of Appeal, *City of Tucson v. Commissioner,* No. 3889–80B (T.C.) (filed July 26, 1982), Appendix II to Brief for Appellant at iii.

**25.** *Fulman v. United States,* 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1, 8 (1978); *Bingler v. Johnson,* 394 U.S. 741, 749–750, 89 S.Ct. 1439, 1444–1445, 22 L.Ed.2d 695, 703–704 (1969); *Commissioner v. South Tex. Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831, 836 (1948); *White v. Winchester Country Club,* 315 U.S. 32, 41, 62 S.Ct. 425, 430, 86 L.Ed. 619, 626 (1942). This "rule of deference," *Fulman v. United States, supra,* 434 U.S. at 533, 98 S.Ct. at 845, 55 L.Ed.2d at 8, is a manifestation of the general doctrine commanding respect for interpretative agency rulings as cogent indicia of legislative intent. E.g., *CBS v. FCC,* 453 U.S. 367, 382, 101 S.Ct. 2813, 2823, 69 L.Ed.2d 706, 720 (1981); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 384 (1969); *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed.

124, 129 (1944). It also is an implementation of the legislative scheme drawing upon agency, not judicial, expertise in revenue matters. E.g., *United States v. Correll,* 389 U.S. 299, 306–307, 88 S.Ct. 445, 449–550, 19 L.Ed.2d 537, 543 (1967).

**26.** See 26 U.S.C. § 103(c)(6) (1982); *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792, 800 (1982); *Merchants Nat'l Bank v. United States,* 583 F.2d 19, 22 (1st Cir.1978); *Goldman v. Commissioner,* 497 F.2d 382, 383 (6th Cir.), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 295 (1974); *Title Ins. & Trust Co. v. United States,* 654 F.2d 604, 606 (9th Cir.1981); *United Telecommunications, Inc. v. Commissioner,* 589 F.2d 1383, 1387 (10th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2839, 61 L.Ed.2d 284 (1979). Courts frequently have justified judicial deference in this area at least in part by reference to the contemporaneity of the challenged interpretation, see, e.g., *Rowan Cos. v. United States,* 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814, 821 (1981); *Fulman v. United States, supra* note 25, 434 U.S. at 533, 98 S.Ct. at 845, 55 L.Ed.2d at 8; *Commisioner v. South Tex. Lumber Co., supra* note 25, 333 U.S. at 501, 68 S.Ct. at 698, 92 L.Ed. at 836; *White v. Winchester Country Club, supra* note 25, 315 U.S. at 41, 62 S.Ct. at 430, 86 L.Ed. at 626, a position reflecting the well-entrenched judicial policy respecting administrative constructions of statutes, e.g., *EEOC v. Associated Dry Goods Corp.,* .449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762, 770 n. 17 (1981); *General Elec. Co. v. Gilbert,* 429 U.S. 125, 142, 97 S.Ct. 401, 411, 50 L.Ed.2d 343, 358 (1976); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965). That the sinking fund regulation is not a contemporaneous interpretation of § 103(c)(2)(B)—as the Department itself expressly concedes, see Brief for Appellee at 26—thus dilutes the deference to be accorded it.

be sustained if it "implement[s] the congressional mandate in some reasonable manner;"[27] it may be nullified only if "unreasonable and plainly inconsistent" with that mandate.[28]

We emphasize, however, that these principles, while providing impetus for judicial validation of disputed regulations, do not give the Treasury Department carte blanche in interpreting the tax laws. As the Supreme Court has put it, the Department sets "the framework for judicial analysis; it does not displace it,"[29] and when we "can measure the Commissioner's interpretation against a specific provision of the Code, we owe the interpretation less deference" than it would otherwise command.[30] Courts routinely have subjected administrative regulations to close scrutiny on review, annulling those that are incompatible with the underlying statute or otherwise unreasonable, including those attempting to "enlarge the scope of the statute."[31] Mindful of these prescriptions, we turn to the issue presented.

## III A.

The Department's sinking fund regulation incorporates an expansive reading of the statutory replacement theory it supposedly implements. Under Section 103(c)(2)(B), a municipal bond issue forfeits its tax exclusion if the issuer uses all or a major portion of the proceeds therefrom to "replace" funds used earlier to acquire higher-yielding securities.[32] Prototypically, a replacement occurs when the issuer places in an investment fund monies that otherwise would be dedicated to a discrete public use, and then channels the proceeds of its bond issue into the void created by the diversion. Section 103(c)(2)(B) endeavors to eliminate this thinly veiled method of circumventing the prohibition on arbitrage. The regulation here assailed, however, reshapes the statutory command and extends it far beyond these contours. It theorizes that proceeds of a municipal bond issue, in whatever manner actually used, "replace" monies, from whatever source derived, deposited in a sinking fund that will be used to pay principal or interest on the bonds.[33] The question whether this formulation is faithful to the replacement concept embodied in Section 103(c)(2)(B) is the crux of this case.

Courts attribute to nontechnical statutory words their "known and ordinary signification."[34] This longstanding guide to

27. *United States v. Correll, supra* note 25, 389 U.S. at 307, 88 S.Ct. at 450, 19 L.Ed.2d at 543.

28. *Commissioner v. South Tex. Lumber Co., supra* note 25, 333 U.S. at 501, 68 S.Ct. at 698, 92 L.Ed. at 836.

29. *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528, 533 (1973).

30. *Rowan Cos. v. United States, supra* note 26, 452 U.S. at 253, 101 S.Ct. at 2292, 68 L.Ed.2d at 821.

31. *Busey v. Deshler Hotel Co.,* 130 F.2d 187, 190 (6th Cir.1942); see also *United States v. Calamaro,* 354 U.S. 351, 357, 359, 77 S.Ct. 1138, 1142, 1143, 1 L.Ed.2d 1394, 1399, 1399–1400 (1957); *Helvering v. Credit Alliance Corp.,* 316 U.S. 107, 113, 62 S.Ct. 989, 992, 86 L.Ed. 1307, 1312 (1942); *Koshland v. Helvering,* 298 U.S. 441, 447, 56 S.Ct. 767, 770, 80 L.Ed. 1268, 1273 (1936); *Iselin v. United States,* 270 U.S. 245, 251, 46 S.Ct. 248, 250, 70 L.Ed. 566, 569–570 (1926); *Lynch v. Tilden Produce Co.,* 265 U.S. 315, 321, 44 S.Ct. 488, 490, 68 L.Ed. 1034, 1036 (1924); *Washington v. Commissioner, supra* note 6, 223 U.S.App.D.C. at 409, 412, 692 F.2d at 133, 136;

*Bates v. United States,* 581 F.2d 575, 579 (6th Cir.1978); *Caterpillar Tractor Co. v. United States,* 589 F.2d 1040, 1045, 218 Ct.Cl. 517 (1978).

Moreover, taxing statutes should be strictly construed and any doubt resolved in favor of the taxpayer. *Davenport v. Ralph N. Peters & Co.,* 386 F.2d 199 (4th Cir.1967); *Bookwalter v. Mayer,* 345 F.2d 476 (8th Cir.1965); *Luben Ind., Inc. v. United States,* 707 F.2d 1037 (9th Cir. 1983); *Renick's Estate v. United States,* 687 F.2d 371, 231 Ct.Cl. 457 (1982); *Mobil Petroleum Co., Inc. v. Blaz,* 416 F.Supp. 98 (D.C. Guam 1975).

32. 26 U.S.C. § 103(c)(2)(B) (1982).

33. The text of the regulation is reproduced in note 16 *supra.*

34. *Old Colony R.R. v. Commissioner,* 284 U.S. 552, 560, 52 S.Ct. 211, 213, 76 L.Ed. 484, 489 (1932) (quoting *Levy v. McCartee,* 31 U.S. (6 Pet.) 102, 110, 8 L.Ed. 334, 337 (1832)); see also *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199 n. 19, 96 S.Ct. 1375, 1384 n. 19, 47 L.Ed.2d 668, 680 n. 19 (1976); *Burns v. Alcala,* 420 U.S. 575, 580–581, 95 S.Ct. 1180, 1184, 43 L.Ed.2d 469, 475 (1975); *Banks v. Chicago Grain Trimmers*

statutory construction assumes special stature with respect to revenue laws in general [35] and Section 103(c) in particular,[36] and we find it dispositive here.[37] As ordinarily used and comprehended, "replace" is equated with such expressions "to take the place of," "to serve as a substitute for or successor of," and "to supplant." [38] The sinking fund regulation simply cannot be reconciled with these common understandings of "replace." By totally ignoring the origin of the sinking fund revenues through subsequent taxation and the uses to which the bond proceeds are to be put, the Treasury Department has severed all connection between the regulation and the precondition to operation of the statute—that the proceeds be used to take the place of, to substitute for, to succeed, to supplant, or, in the language of the statute, to "replace" monies deposited into the sinking fund.[39]

This construction of "replace" is bolstered by use of the past tense in the replacement formula in Section 103(c)(2)(B) —"to replace funds which *were* used directly or indirectly to acquire securities" offering materially higher yields.[40] Congress limited its language to funds already invested in higher-interest obligations that are subsequently recouped through a bond issue.

The disassociation of the statute from the regulation becomes all the more evident when we look once again to the facts of this case. As we have noted, the monies comprising the City's sinking fund are derived, as required by state law, from ad valorem property taxes levied for the sole purpose of defraying debt service on outstanding bond issues.[41] In its effort to justify application of the arbitrage rule of the statute in these circumstances, the Department argues that proceeds of the City's bond issues "replace" tax revenues yet to be raised, and which might never be

*Ass'n*, 390 U.S. 459, 465, 88 S.Ct. 1140, 1144, 20 L.Ed.2d 30, 36 (1968); *Addison v. Holly Hill Fruit Prods., Inc.*, 322 U.S. 607, 617–618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488, 1496 (1944); *United States v. First Nat'l Bank*, 234 U.S. 245, 258, 34 S.Ct. 846, 849, 58 L.Ed. 1298, 1303–1304 (1914); *Maillard v. Lawrence*, 57 U.S. (16 How.) 251, 261, 14 L.Ed. 925, 930 (1854).

**35.** *Malat v. Riddell*, 383 U.S. 569, 571–572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102, 104 (1966) (per curiam); *Hanover Bank v. Commissioner*, 369 U.S. 672, 687, 82 S.Ct. 1080, 1089, 8 L.Ed.2d 187, 197 (1962); *Commisioner v. Korell*, 339 U.S. 619, 627–628, 70 S.Ct. 905, 909, 94 L.Ed. 1108, 1114 (1950); *Crane v. Commissioner*, 331 U.S. 1, 6, 67 S.Ct. 1047, 1051, 91 L.Ed. 1301, 1306 (1947); *Helvering v. William Flaccus Oak Leather Co.*, 313 U.S. 247, 249, 61 S.Ct. 878, 880, 85 L.Ed. 1310, 1312 (1941); *Helvering v. San Joaquin Fruit & Inv. Co.*, 297 U.S. 496, 499, 56 S.Ct. 569, 570, 80 L.Ed. 824, 826 (1936); *Lang v. Commissioner*, 289 U.S. 109, 111, 53 S.Ct. 534, 535, 77 L.Ed. 1066, 1068 (1933); *De Ganay v. Lederer*, 250 U.S. 376, 381, 39 S.Ct. 524, 525, 63 L.Ed. 1042, 1044 (1919); *United States v. Buffalo Natural Gas Fuel Co.*, 172 U.S. 339, 341, 19 S.Ct. 200, 201, 43 L.Ed. 469, 470 (1899).

**36.** *Washington v. Commissioner, supra* note 6, 223 U.S.App.D.C. at 407, 408, 409, 413, 692 F.2d at 131, 132, 133, 137 (according language in § 103(c) its "common and accepted meaning," its "most natural reading" and its "commonly accepted meaning," while rejecting the "awk-

ward construction" proposed by the Department).

**37.** The Department has not argued, nor could we agree, that the word "replace" in § 103(c) is a technical term endowed with a specialized meaning. Neither the statutory text nor the legislative history suggests that Congress endowed this term with anything other than its ordinary and usual signification. We thus perceive no occasion for departure from traditional standards of statutory construction in this case.

**38.** Webster's Third New International Dictionary 1925 (1976).

**39.** The perception of replacement pervading the sinking fund regulation has eased actual bond "proceeds" completely out of the regulatory picture, notwithstanding that these "proceeds" are one of two central elements in § 103(c)(2)'s formulation. The regulation itself exposes the distortion inflicted upon the statutory scheme by declaring unqualifiedly that monies held in a sinking fund are to be "treated as proceeds of the issue." Treas.Reg. § 1.103–13(g)(1) (1979). Ignoring, as it does, the particular circumstances involved, the regulation further reflects the Department's fundamental restructuring of the statutory replacement formula.

**40.** 26 U.S.C. § 103(c)(2)(B) (1982) (emphasis added), quoted in relevant part in text *supra* at note 9.

**41.** See text *supra* at note 19.

raised but for the bond issues.[42] This unrealistic position serves only to confirm our conclusion that the regulation is predicated upon a notion of replacement unrecognizable in the statute.

Persuaded by this analysis that the disputed regulation stretches the language of Section 103(c)(2)(B) beyond the breaking point, we cannot sustain it as an authorized implementation thereof.[43] In our view, the Treasury Department has sought to sculpt a straight-forward statutory provision aimed at transactions in which bond proceeds replace funds previously invested in higher-yielding securities into a regulatory proscription encompassing financial arrangements for retirement of the bond issue by after-acquired funds temporarily so invested. In so doing, the Department has forged, not a reasonable implementation of the legislative mandate, but rather an impermissible enlargement by an unnatural construction of the statutory language.

### B.

Our holding is fortified by consideration of the far-reaching consequences potentially attending the Department's approach to Section 103(c)(2)(B). Although the regulation by its terms applies only to bond issues to be serviced by "amounts held in a sinking fund,"[44] the statutory interpretation upon which it rests is not so confined. Imbedded in the regulation is the thought that a replacement occurs each time municipal bonds issue, simply by virtue of the obligation and mechanics of repayment.[45] Unless debt service is contractually confined to availability of earmarked funds, the issuer's general revenues will constitute the source from which payments of principal and interest will be made. The statutory theory advanced by the Department to rationalize the role that the regulation assigns to sinking funds contains at least the rudiments of a tentacular approach barring—with respect at least to issues not to be retired exclusively by funds set aside and designated for that purpose—investments of general revenues as a derogation of Section 103(c)(2)(B). We think the wide swath such an approach threatens to cut into municipal investment alternatives underscores the incongruity between the sinking fund regulation and the statutory restriction. Indeed, since we have held that Section 103(c) does not encompass all transactions in which a municipal bond issue serves as an investment conduit,[46] the section cannot reasonably be construed to impose such a widescale embargo on the financial practices of state and local governments.

Seeking to parry this logic, the Department insists[47] that the regulation applies, not to revenues merely available to retire debt, but only to funds the issuer "reasonably expects to use ... to pay principal or

---

**42.** Brief for Appellee at 11, 28–32. The Tax Court seems to have assumed that property taxes would have been levied, collected, and used to finance public works had the City's bonds never issued. *City of Tucson v. Commissioner, supra* note 3, 78 T.C. at 783. We find no basis for this inference. On the record before us, there is no way of knowing whether these taxes, even were they assessed absent the bond issues, would be used for, or would prove immediately adequate to the task of, financing public works.

**43.** Tacitly conceding that the statutory term "replace" cannot bear the full weight of the regulation, the Department contends that congressional insertion of the adverb "indirectly" into § 103(c)(2) broadens its coverage sufficiently to support the regulation as an authorized implementation of subparagraph (B). See Brief for Appellee at 31; Appellee's Response to Brief for National Association of Bond Lawyers as Amicus Curiae at 1–2. We disagree. The word "indirectly" does not oust, but only modifies, the subsequent statutory word "replace." It thus cannot sanction a regulation that bypasses rather than effectuates the replacement concept integral to the section.

**44.** Treas.Reg. § 1.103–13(g)(1) (1979).

**45.** As the Tax Court stated in its decision upholding the regulation,

in every borrowing it may be said generally that a replacement of funds occurs; namely, the substitution of borrowed funds for moneys reasonably anticipated to be earned or collected in the future to repay the debt.

*City of Tucson v. Commissioner, supra* note 3, 78 T.C. at 784 n. 21.

**46.** *Washington v. Commissioner, supra* note 6, 223 U.S.App.D.C. at 411, 692 F.2d at 135.

**47.** See Brief for Appellee at 33.

interest on the issue." [48] We do not agree, however, that this limitation inheres in the theory animating the regulation. The Department itself has endorsed the proposition that funds which plainly are not bond proceeds may, at least in some circumstances, be subject to Section 103(c)'s restriction even if not reasonably expected to be used for debt service.[49] The Department has indicated its willingness to apply the restriction to funds thus used "indirectly" though not actually to retire bond debt,[50] as well as to transactions deemed "an artifice or device" in circumvention of Section 103(c),[51] thus further rebutting any idea of adherence to a reasonable-expectation standard. We note, too, that occasionally the Department has articulated an alternative standard in holding that funds are subject to the statutory limitation when invested in securities bearing a "nexus or sufficiently direct relationship" with the bond issue.[52]

Instead of disproving the claim that its replacement concept augurs widescale intrusion into the financial policies of state and local governments, the Department's disparate practices have accentuated our concerns on that score. It is but a small step from the broad positions already advanced to the stance that availability of funds to pay principal and interest on municipal bonds, without more, renders the statutory limitation applicable thereto. For instance, the Department, in a treasury regulation, opines that a reserve fund not designed for debt service on a municipal issue nevertheless is to be governed by Section 103(c) if the fund is pledged as collateral.[53] Although the Department has declined to push this reasoning beyond the facts hypothesized,[54] an unsurprising outgrowth of the Department's thinking could well be a wielding of the statutory prohibition against general revenues simply because of their availability to pay principal or interest, especially when, as commonly occurs,[55] they are "pledged" as collateral for the issue. Surely the Department's idea of "arbitrage"—any pecuniary benefit whatsoever from exploitation of the interest differential [56]—is broad enough to sanction that doctrinal extension. Under a scheme of this sort, mere use of available monies to purchase higher-yielding securities, rather than to discharge principal or interest indebtedness on the bond issue, might easily be characterized as an enlistment of the differential, and hence as arbitrage.

◼ Accordingly, the Department's protestations to the contrary notwithstanding,

**48.** Treas.Reg. § 1.103–13(g)(2) (1979).

**49.** See Treas.Reg. § 1.103–14(e)(7)(B)(ii), Example 1 (1979).

**50.** See Rev.Rul. 78–302, 1978–2 C.B. 94, 94–95, Situation 2 (implementing the statutory provision pertaining to bond proceeds expectably to be used "indirectly" to acquire higher-yielding securities).

**51.** See Treas.Reg. § 1.103–13(j) (1979). Neither the Department's implementation of § 103(c)(2)'s indirect-use provision nor its pronouncement concerning transactions belying "artifice or device" is at issue on this appeal. They do, however, shed light on the statutory theory underlying the sinking fund regulation.

**52.** See Rev.Rul. 78–348, 1978–2 C.B. 95, 96; see also Rev.Rul. 82–101, 1982–1 C.B. 21, 22.

**53.** See note 49 *supra.*

**54.** See, e.g., Rev.Rul. 78–302, *supra* note 50, 1978–2 C.B. 94, 95, Situation 1 ("reserve fund" constitutes sinking fund subject to yield restriction because "pledged as security" for the issue); Rev.Rul. 78–348, *supra* note 52, 1978–2 C.B. 95, 96 (nexus required by § 103(c)(2)(B) exists where higher-yielding securities are pledged as collateral); Rev.Rul. 82–101, *supra* note 52, 1982–1 C.B. 95, 96 (requiring "a reasonable assurance that the collateral will be available if needed to pay debt service").

**55.** See Peaslee, *supra* note 5, at 439.

**56.** See Brief for Appellee at 30. The Tax Court endorsed this proposition, *City of Tucson v. Commissioner, supra* note 3, 78 T.C. at 784, but we cannot accept such a cavernous definition of "arbitrage." By enactment of the tax exemption for municipal bonds, Congress contemplated that successful marketing of such securities to finance public works often would relieve general revenues of that burden. The activities precipitating adoption of § 103(c)—pursuit by state and local governments of "arbitrage" profits, *Washington v. Commissioner, supra* note 6, 223 U.S.App.D.C. at 410–411, 692 F.2d at 134–135—involved, not freedom of general revenues for general purposes, but exploitation of the interest differential through investment of bond proceeds to generate additional revenues.

we are persuaded that the replacement theory spawning the challenged regulation portends a sphere of operation for Section 103(c) surpassing regulation of sinking funds expectably to provide debt service on bond issues, and extends potentially to investment of an issuer's general revenues pending maturity of outstanding obligations. That neither the terms nor the legislative antecedents of Section 103(c) reveal a congressional purpose to hold general municipal revenues hostage to its restriction buttresses our conclusion that the Department entertains a notion of replacement significantly at odds with the underlying statutory precept.

Finally, we note that the Department's interpretational technique not only inflates Section 103(c) beyond its intended configuration, but also casts an administrative role for the Department disproportionate to the congressional design. Early drafts of that section envisioned a wholesale delegation to the Department of power to define "arbitrage bond," but Congress plainly abjured that route by substituting a "mechanical" test in conjunction with a narrower grant of rulemaking power to the Department.[57] By an idiosyncratic construction of Section 103(c), however, the Department has undertaken to expand its authority in a manner that would largely reinstate the defunct legislative approach. In accepting the natural and ordinary meaning of the statutory language as the most reliable indication of its intended effect, our decision also restores regulatory equanimity in this area.

## IV

With all due regard for the Treasury Department's pivotal role as administrator of the revenue laws, and as well its considerable expertise in the field of taxation, we hold that the challenged regulation exceeds the Department's delegated power to implement Section 103(c)(2)(B). The regulation attributes to the statutory word "replace" an unnatural and unreasonably broad interpretation, and thereby enlarges both the section's coverage and the Department's administrative authority beyond the boundaries contemplated by Congress. Accordingly, we reverse the order of the Tax Court and remand the case for proceedings not inconsistent with this opinion.

*So ordered.*

J. SKELLY WRIGHT, Senior Circuit Judge, dissenting:

Implementation of the congressional ban on "arbitrage bonds" embodied in Section 103(a)(1) of the Internal Revenue Code is a complicated and delicate matter, as the length and detail of Judge Robinson's scholarly opinion demonstrate. For two closely related reasons, I cannot join that opinion.

First, I substantially agree with the reasoning of the Tax Court in this matter. *See City of Tucson v. Commissioner,* 78 T.C. 767 (1982). The Commissioner's conclusion that sinking fund financing of municipal bonds effectively allows bond proceeds *indirectly* to replace funds used to acquire higher yield securities *indirectly* seems to me an eminently reasonable position.

Second, the courts have consistently recognized that the Internal Revenue Service should be given a fair amount of breathing space in its implementation of the Internal Revenue Code's convoluted nooks and crannies. *See, e.g., Fulman v. United States,* 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978). No more complex and arcane a statute exists than the IRC. When, as here, IRS has taken a reasonable, albeit broad, view of the meaning of one of the Code's provisions, we should defer to that view.

Accordingly, I respectfully dissent.

---

**57.** The underlying legislative history is recounted in *Washington v. Commissioner,* supra note 6, 223 U.S.App.D.C. at 412, 692 F.2d at 136, in

which we stated flatly that "Congress implicitly rejected any grant of unlimited authority to Treasury to define arbitrage bonds...." *Id.*